[Civ. No. 1866. Third Appellate District.—October 3, 1918.]

PERCY T. FERERIRA, Respondent, v. F. J. SILVEY et al., Appellants.

EMPLOYER AND EMPLOYEE—PERSONAL INJURIES—VICIOUS MULE—SUFFICIENCY OF EVIDENCE.—In this action by a ranch hand to recover damages for personal injuries sustained through the running away of a team, composed of a mule and a horse hitched to a mowing-machine, which the, plaintiff was required to operate in the course of his employment, the evidence is held sufficient to sustain an implied finding of the jury that the mule was wild and vicious and had a propensity for running away, and was unsafe to be employed in the ordinary business of a farm.

ID.—EMPLOYER'S KNOWLEDGE OF DANGER.—Where, in such action, there was some evidence, though slight, that one of the members of defendant partnership knew at the time plaintiff was employed that the mule was given to running away, an appellate court cannot say that such evidence was insufficient to support an implied finding of the jury that the defendants were thoroughly aware of the vicious and dangerous nature of the animal.

ID.—EMPLOYEE'S KNOWLEDGE—CONFLICT OF EVIDENCE—QUESTION FOR JURY.—There being a conflict of evidence in such case as to whether the plaintiff knew of the mule's dangerous nature and its disposition to run away, that question became one solely for the jury.

ID.—EMPLOYEE'S RELIANCE ON EMPLOYER'S ASSURANCES.—The plaintiff in such case had the right to rely on the assurance of one of his employers, as to the gentleness of the mule, although his own observation of the mule's actions might have generated a suspicion that the animal was not so gentle and tractable as not to require constant watching.

ID.—COPARTNERSHIP—KNOWLEDGE OF ONE PARTNER IMPUTED TO ALL.— The knowledge of one partner that the mule in such case had, on a prior occasion, run away, without any apparent cause, is imputed to all the defendants, it being a duty resting on all partners to know whether the instrumentalities with which they require their servants to perform services for them are safe or unsafe.

ID.—PROXIMATE CAUSE OF INJURY—QUESTION FOR JURY.—Where there was some evidence that the animal in question had been frightened

by the wind blowing something in front of it, the question whether the accident was the result of a cause wholly beyond human control, or the direct result of the wild and vicious tendencies of the animal, was one peculiarly within the province of the jury to decide.

ID.—NONSUIT—PROPER DENIAL.—Where the plaintiff has made out a *prima facie* case in support of the averments of his complaint, a trial court has no legal right to take the case from the jury.

ID.—INSTRUCTIONS TO JURY.—Instructions, in effect, that to render the owner of a dangerous or vicious animal, who permits another to use or drive it, liable for injury produced by such animal, such owner must have known, at the time he furnished such animal to another to be used or driven by him, of the dangerous nature of such animal, are correct.

ID.—UNPREJUDICIAL REFUSAL OF PROPOSED INSTRUCTION.—Refusal of an instruction proposed by the defendants was unprejudicial where the court had orally, and in clearly understandable language, instructed the jury to the same effect.

JURY AND JURORS—MISCONDUCT.—A juror cannot impeach his own verdict for alleged misconduct where the evidence of such misconduct is offered by the party against whom the verdict was given, and, therefore, the affidavits of any juror as to the considerations governing or influencing him or his fellow-jurors in arriving at a verdict cannot be reviewed.

ID.—SENDING INSTRUCTIONS TO JURY-ROOM.—It cannot be said that prejudice to either party could have followed from the fact that after the jury had retired and deliberated, the court sent the written instructions to the jury-room, and that the jurors were thus given an opportunity to read, and did read, the instructions which had been read to them by the court.

APPEAL from a judgment of the Superior Court of Sacramento County.    Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

Martin I. Welsh, for Appellants.

Hughes, Bradford & Cross, for Respondent.

HART, J.—Plaintiff brought the action to recover from defendants damages for personal injuries received by plaintiff by reason of a team belonging to defendants running away. Judgment, following the verdict of a jury, was entered in favor of plaintiff and against the defendants, individually and

as copartners, for the sum of five thousand dollars, from which judgment defendants prosecute this appeal.

Defendants are farmers, and, at the time of the injury complained of, were engaged in general farm work in Solano County. On the 25th of April, 1915, plaintiff was employed by them as a general ranch hand. At that time he was twenty-eight years of age, in good physical condition and was earning $40 per month and board. On the third day of June, 1915, the defendant, Frank Silvey, directed plaintiff to cut hay and to use for that purpose a certain team composed of one horse and one mule. Plaintiff hitched the team to a mower, the mule being on the off or right side. The mower was a right-hand cut, the sickle-bar being on the right side. Plaintiff started cutting hay and on the first round the tongue of the mower fell down. He threw the sickle out of gear, tied the lines on the lever, went to the left, past the horse, and "grabbed the mule by the halter," as he testified. At that time "the north wind blowed, it came out, a little piece of hay, the team jumped, started to run away." He said that the piece of hay was about the size of his hat. The mule forced him down on the bar, the sickle cut him in various places and he was dragged for a distance of several hundred feet.

Dr. John L. White, who attended plaintiff, testified that "he had a comminuted fracture—that is, a fracture in two or more places. He also had two perforations about, just above the knee, and he had several abrasions on the leg below —between the knee and the ankle. . . . The bone had protruded the flesh before I saw him, on the inner side, I believe. . . . There is an overlapping of the bones of the leg, making the leg about three and one half inches shorter; . . . he will always have a shorter leg and will never have the same use of it that he once had; he will not be able to conduct himself as a laborer."

Appellants insist that the evidence does not show that the mule was of a wild and of a vicious nature or disposition.

The plaintiff testified that, soon after his employment by defendants, he said to defendant, Silvey: "This team must be a lively team," to which Silvey replied: "This is a gentle team, he was like that because he don't work for four or five months." Plaintiff said he talked to defendant, Silvey, several times about the team. "Mr. Silvey says, 'Gentle team.' Q. What did you tell him at the time? A. I says, 'No look

like to me.' Q. No look like to you? A. Because lively—lively team. Q. Why did you state to Mr. Silvey that it was a lively team? A. Because I saw them in the corral, jump, jump all the time, playing.'' On another occasion when he hitched up the team he said: '' 'The horses, they jump lively.' I says: 'Mr. Silvey, look to me better be careful with this team.' He says: 'This is a gentle team.' '' The plaintiff said that he was never informed that the mule had run away.

On cross-examination he testified that he had been handling horses and mules about eight years and considered himself a first-class teamster; that he had driven the team in question four or five times; that someone helped him every time he took the mule out of the corral; that the mule looked to him wild—''lively mule''—and that he was ''scared of him'' because he saw him jump in the corral and kick the cows.

John Santos, called as a witness for the plaintiff, testified that he had a short time previously to the accident to the plaintiff worked for the defendants on their ranch near Dixon; that his employment required him to drive a team, and that he drove a team of which the mule in question was one; that, on one occasion, while so employed and engaged in cutting grass ''on the edge of the levee,'' the team he was driving, the said mule being one, suddenly started to run and ran a considerable distance. He said that the defendant, Lewis, having learned of the ''runaway,'' went to him (witness) and ''started quarreling at me, growling at me,'' because the team ran away, and the witness thereupon quit working for the defendants.

The foregoing testimony is sufficient to support the implied findings of the jury that the mule in question was of a wild and vicious disposition, with a propensity for running away from the control of its driver, and that it was just such an animal of the horse variety which it would be unsafe to employ in the ordinary purposes of a farm. But it is further contended that, ''assuming that the mule was of a wild and vicious nature, the evidence does not show that defendants, or either of them, had knowledge of such wildness or viciousness.'' It is true that the evidence is slight upon that proposition, but, as above shown, there is some evidence tending to show that the defendant, Lewis, knew before he employed the plaintiff that the mule was given to running away, and we cannot say that the evidence referred to is not sufficient to support

the implied finding that said Lewis, when the plaintiff was employed by the defendants, was thoroughly familiar with the vicious and dangerous nature of the mule and its predilection for running away or violently releasing itself from the control of its driver when being used for the ordinary farming purposes of the ranch of the defendants.

It is insisted, however, that the plaintiff was fully aware of the wild and unruly nature of the mule before the mishap here complained of occurred, and, therefore, himself assumed whatever risk attended the handling of the animal. To this proposition, the plaintiff makes a twofold reply, to wit: 1. That the doctrine of the assumption of risk is no longer a legal defense in this state in personal injury cases, the defense of the assumption of risk having been expressly abrogated by the Employers' Liability Act, popularly known as the "Roseberry Act," passed by the legislature of 1911 (Stats. 1911, p. 796); 2. That the evidence is conflicting upon the question whether the plaintiff knew of the disposition of the mule to run away, from no special cause, and that, therefore, the finding of the jury thereon forecloses a review of the point by this court.

The impression, at least to some extent, has prevailed that the "Roseberry Act" and all its provisions, except such as might have been retained in the statute known as the "Workmen's Compensation Act," were repealed by the latter act, which was passed by the legislature of 1913 (Stats. 1913, p. 279), it being generally supposed that the scheme as established by the Workmen's Compensation Act for the protection and compensation of servants suffering personal injuries in the course of their employment and while engaged therein was intended as a substitute for that embraced in the Roseberry Act. In *Barrett* v. *Metropolitan Contracting Co.*, 172 Cal. 116, [155 Pac. 645], which was decided on February 15, 1916, the supreme court unqualifiedly declares that in such a case as this it is essential to a recovery that the plaintiff be ignorant of the viciousness of the animal until the injury has happened. But we do not deem it necessary in this case to pass upon the question, since counsel for the appellants have not raised the point that the provision of the Roseberry Act excluding assumption of risk as a defense in a personal injury case to which such a defense would under the facts be pertinent is now and was at the time the injuries complained of here

occurred nonexistent, and, since, particularly, we agree with the respondent on the proposition that there is a conflict in the evidence upon the question whether the plaintiff, previously to the time he was injured through the running away of the mule, knew of the disposition of the mule to perform in that dangerous manner, and that, therefore, the question became one solely for the determination of the jury.

The plaintiff testified (and in this he was not contradicted) that he had altogether "hitched the mule up" and driven it five different times only, and, while (as he stated) he had observed that the mule was a very "lively" animal and had several times told Silvey, one of the defendants, that he believed the mule was inclined to be "lively," he was invariably assured by the said defendant that the team was perfectly gentle, and thus he was soothed into a feeling of security and safety in the handling of the team. The plaintiff was not told by the defendants or by any other person that the same mule had, prior to his employment by the defendants, run away while being used or driven by the witness, Santos, who had formerly worked for the defendants, performing services similar to those assigned to the plaintiff on the ranch of the defendants. The plaintiff had the right to assume that Silvey's repeated assurances of the gentleness of the mule and the team of which said mule was a part were well founded and true, notwithstanding that the actions of the mule coming under his observation might have generated in his mind some suspicion that the animal was not so gentle and tractable as not to require vigilant watching and handling when being used in the usual employments of the ranch. In this connection, it may be observed that it was, obviously, the duty of the defendants to have given the plaintiff, on requiring him to use the mule in question in the prosecution of the employment to which they assigned him, any information they possessed regarding the dispostion of the mule to act viciously or to run away. As has been shown, Lewis knew that the mule, without any apparent cause, had run away on an occasion prior to the time at which the defendants employed the plaintiff, and here it may be parenthetically stated that if the other defendants, who were the partners of Lewis, both at the time the mule ran away from Santos and at the time of the employment of plaintiff, did not, in point of fact, know of the circumstance of the running away of the mule from Santos, then knowledge of

that circumstance is to be imputed to them. (*Clowdis* v. *Fresno Flume & Irr. Co.*, 118 Cal. 315, [62 Am. St. Rep. 238, 50 Pac. 373]; *Barrett* v. *Metropolitan Contracting Co.*, 172 Cal. 116, [155 Pac. 645]; *Kittredge* v. *Elliott*, 16 N. H. 77, [41 Am. Dec. 717]; *Harris* v. *Carstens Pkg. Co.*, 43 Wash. 647, [86 Pac. 1125, 6 L. R. A. (N. S.) 1164, 1169].) It was, of course, a duty resting alike upon all the partners to know whether the instrumentalities with which they required their servants to perform services for them were safe or unsafe.

The point next urged against the plaintiff's right to a recovery arises from the fact, above mentioned, that, just before the team started to run, a small bunch of hay was blown by the north wind near the team and close to their heads. It is contended that that circumstance caused the team to become frightened and to run. It is hence argued that but for the happening of that circumstance, the team would not have become frightened and so would not have started to run and that, therefore, the proximate cause of the injury to the plaintiff was directly imputable to that circumstance, which was beyond the control of human agency. In other words, the contention is that the accident and consequent injuries to the plaintiff were proximately caused by "an act of God."

We have given above the testimony of the plaintiff as to the circumstance of the small bunch of hay being driven by the north wind, then prevailing, to a point in close proximity to the team, when it became frightened and started to run. It is not necessary to reproduce that testimony here, except to repeat that the plaintiff described the bunch of hay as being about the size of a man's hat, and said that the hay did not strike or touch either the mule or the horse. We cannot say, as a matter of law, that the cause of the "runaway" was entirely due to the blowing of the hay near the team, as indicated. That circumstance might have had something to do with starting the team. It, indeed, may be conceded that it did, and still it was for the jury to say whether that circumstance was the proximate cause of the accident and injury. Common experience justifies the observation that the average work-horse or mule, having been thoroughly "broken" to the harness and the ordinary burdens cast upon horses, is so gentle in his relations with those using him for the purposes to which he has been educated—that is, is so bereft of nervousness or of an inclination to become nervous—that the mere blowing of hay

or paper in front of or near him would have no effect upon him. In truth, it is commonly known that the blowing of a steam whistle or the noise of an automobile, or, what is infinitely worse, the noise of a motorcycle, as it is ordinarily propelled through streets and over highways, does not disturb in the least the average work-horse in these days. On the other hand, it is known that the slightest noise or disturbance of any character will often arouse to a high pitch the nervousness of a spirited or high-strung horse. Such an animal is generally looking for such trouble from natural fear, and is ready to run or become unmanageable from the slightest causes, which would not disturb the average work-horse. Such an animal is naturally wild in disposition, and dangerous, and it is just such a horse that a master should never give over to his servant to use without first acquainting the servant with its dangerous disposition. In this case, the jury could well have concluded and perhaps did conclude from the evidence that the mule in question, although ''broke'' to the harness, was still of a mean, or nervous and spirited disposition, with an inclination to put into action such disposition from causes which may properly be regarded as of the most trivial nature when it is considered that the average work-animal would pay no attention to them, and that the blowing of the bunch of hay to a point near where it was standing or moving only had the effect of startling it and arousing to action its wild and vicious disposition. Such a finding would not be inconsistent with the theory that the proximate cause of the plaintiff's injuries was the vicious disposition of the mule and the failure of the defendants, who knew of the propensity of that animal to run away, to inform the plaintiff, who then had no knowledge thereof, of the mule's dangerous disposition when the animal was given into his hands as one of the instrumentalities through which he was required to perform his duties as a servant of the defendants.

The foregoing considerations clearly show, we think, that the question whether the accident was the result solely of an act of God or a cause wholly beyond human control or the direct result of the wild and vicious tendencies of the team or the mule in question, together with the failure of the defendants to invest the plaintiff with their knowledge of the dangerous characteristics of the animal when they required him to use the mule to carry out his contract of employment

38 Cal. App.—23

with them, was one peculiarly within the province of the jury to decide. Hence, as to that question, the verdict is conclusive upon this court.

The next point made by the appellants is that the court erred in making the order denying their motion for a nonsuit on the close of the case for the plaintiff. The consideration of the evidence in the foregoing discussion necessarily answers this point adversely to the position of the defendants. It is not out of place to suggest, however, that no rule is better settled in this state than that, where the plaintiff has made out by the evidence a *prima facie* case in support of the averments of his complaint, the trial court has no legal right to take the case from the jury. Some of the leading cases upon this proposition are cited in *Boyle* v. *Coast Improvement Co.,* 27 Cal. App. 714, 721, 722, [151 Pac. 25], in which also the rule is stated and applied. Obviously, a reading of the testimony, even as synoptically given herein, will convince any fair-minded person that the plaintiff more than made out a *prima facie* case of culpable negligence on the part of the defendants as the direct cause of the injuries sustained by him.

The court's action in giving and refusing certain instructions is next attacked. The only given instruction of which complaint is advanced reads as follows: "The court instructs you as a matter of law that the owner of a dangerous mule or other animal, knowing the same to be dangerous to anyone who might drive or use it, owes the duty of not permitting others to drive the same without informing any such other person or persons of the fact of the dangerousness of such animal; and this is true whatever may be the relation of such owner to such other person or persons. And in this case, if you believe from the preponderance of the testimony that the defendants knowingly permitted the plaintiff to use or drive any mule dangerous to be used or driven, without informing plaintiff of the dangerousness of the same, and the plaintiff, while endeavoring to use said mule, without fault or neglect upon his part, and without knowing the dangerousness of the same, is injured, then the defendants are liable to plaintiff for such damages as he may sustain by reason thereof."

The appellants declare that identically the same instruction was condemned as erroneous in *Finney* v. *Curtis,* 78 Cal.

498, 500, 501, [21 Pac. 120]. But there is a dissimilarity between the two instructions as to a vital element. The instruction in the Finney case made the defendant liable without reference to his knowledge of the vicious nature of the horse. The court said: "The rule is well settled that the owner of an animal, not naturally vicious, is not liable for an injury done by such animal, unless it is affirmatively shown, not only that it was vicious, but that such owner had knowledge of the fact," citing Shearman & Redfield on Negligence, sections 1887, 1888, and Sutherland on Damages, section 53. The instruction complained of in this case (above reproduced herein in its entirety) declares, as will be noted, that, to render the owner of a dangerous or vicious mule or animal liable for injury produced by such animal, such owner must have known, at the time he furnished such animal to another to be used or driven by him, of the dangerousness of such animal. Moreover, the court incorporated into its charge to the jury several instructions requested by the defendants themselves, in which the proposition that it was necessary, before the plaintiff would be entitled to prevail, to show that the defendants had previous knowledge of the vicious nature of the mule, was clearly stated. The jury could not have misunderstood the law in that respect.

It is claimed that the court erred by refusing to allow the defendants' proposed instruction in which it was declared that the element of negligence sought to be stated in the allegation of the complaint that the "harness on said team . . . was defective in that the breast strap or chain was not made for the purpose, but was a halter chain, substituted and used as a breast chain, and was unsuitable for such purpose, and it was known by said defendants, and each of them, that it was unsuitable for such purpose, and was used on said mule," etc., had been eliminated from the case as one of the alleged acts of negligence directly responsible for the plaintiff's injuries, and that the issue as to the alleged negligence of the defendants was thus reduced to the single proposition whether the mule was of a vicious nature, and whether the defendants had knowledge of his dangerous characteristics before and at the time the mule was given over to the plaintiff to be used by him in his employment with the defendants, and did not put the plaintiff in possession of knowledge of the dangerous disposition of the animal.

The plaintiff had testified that the breast-strap broke and the tongue of the mower fell to the ground, and that he ran to the head of the mule and grasped the halter which was on the animal. The court admitted this evidence, not as addressed to an issue of negligence upon which the plaintiff relied for a recovery, but as bearing upon the question whether the plaintiff, in going to the head of the team and taking hold of the halter attached to the mule, was, all the circumstances considered, guilty of contributory negligence. The court, as above stated, refused to adopt the instruction of the defendants declaring that the plaintiff did not rely upon the alleged defectiveness of the harness as a basis for a recovery, but, orally, and in very plain, clear, and readily understandable language, instructed the jury to that effect. We think, therefore, that the rejection of the instruction preferred by the defendants cannot be held to have been prejudicial.

In this connection, we may remark that the general charge of the court was a fair and clear statement or exposition of the principles applicable to those cases of personal injury, like the one before us, where the master is charged with having failed to furnish his servant with reasonably safe instrumentalities with which to perform the service to which the latter is assigned, and by reason of such failure or omission on the part of the master the servant suffers personal injury in the course of his employment. We may further suggest that the instructions proceeded upon the theory that the doctrine of assumption of risk is still a legal defense in those personal injury cases where it is pertinent to the facts. Whether the court was right in that respect, we are not, as heretofore stated, prepared to say at this time; nor are we required to pass upon that question in this connection, since it is obvious that the theory upon which the instructions were framed in the particular referred to was not unfavorable to the defendants, nor, as the result of the trial shows, prejudicial to the plaintiff.

The next and last point arises from the circumstance that the judge of the court below, after the case had been given to the jury and the latter had been engaged in deliberation thereon for about an hour, sent the written instructions to the jury-room at the request of the jury. This circumstance furnished one of the several grounds upon which the motion for

a new trial was based and pressed before the trial court, and it was supported by the affidavits of counsel for the defendants, a deputy county clerk, the deputy sheriff under whose charge the jury were placed upon the submission of the case, and several of the jurors. All the jurors but one (Juror Cutshall) deposed that before they called for the instructions they had taken a ballot upon the question whether the plaintiff or the defendants were entitled to a verdict, and that they thereby unanimously agreed to a verdict in an undetermined amount of damages in favor of the plaintiff; that, before the question of the amount of damages to which the plaintiff was entitled was considered by them, it was suggested by one of the jurors that they send out and secure the instructions which the court had read to them. They thereupon requested the deputy sheriff, in whose charge they were, to see the judge and ask him to send them the instructions he had read to them. Cutshall deposed that a difference of opinion arose between the jurors upon the question whether the defendants could be held liable for the alleged negligence in furnishing the plaintiff with defective harness. The instruction given by the court upon that proposition, it will be remembered, was orally given, or not in writing. The attorneys for the defendant each deposed that the instructions were sent to the jury without his knowledge or consent. J. R. Hughes, one of the attorneys for the plaintiff, deposed that he was in conversation with Martin I. Welsh, one of the attorneys for the defendants, in the rotunda of the courthouse, near the entrance to Department 2 of the superior court, when the deputy sheriff having charge of the jury passed them and stated, in reply to a question by Welsh as to what the jury were doing, that the jury had asked for the instructions and that he was on his way to communicate the request by the jury for the instructions to the judge; that thereafter affiant and Welsh went into the courtroom of Department 2 and there continued their conversation, when the said deputy sheriff appeared in said courtroom and affiant, in the immediate presence and hearing of said Welsh, asked said deputy: "What has become of the jury?" and said deputy replied: "Oh, the judge has sent the instructions in to them."

It is a well-established principle, founded in public policy, that a juror cannot impeach his own verdict for alleged

misconduct, where the evidence of such misconduct is, as here, offered by the party against whom the verdict was given. (See *People* v. *Chin Non,* 146 Cal. 561, [80 Pac. 681], and cases therein cited.) It follows, therefore, that the affidavit of any juror in this case as to the considerations governing or influencing him or his fellow-jurors in arriving at a verdict cannot be reviewed. But, for the moment and for the purposes of the discussion only, waiving this proposition and considering the affidavits, it is to be observed that, as above stated, all the jurors save and except Juror Cutshall, declared in their affidavits that it had been unanimously agreed that the plaintiff was entitled to a verdict under the evidence, without then voting upon or deciding the question of the amount thereof, before the instructions were sent for or any suggestion made that they be secured and brought to them. Therefore, if the affidavits were properly reviewable, it was within the discretion of the trial court to hold, upon the showing thus made, that the jurors unanimously agreed upon a verdict, irrespective of the amount, before the suggestion to send for the instructions was made or the instructions sent for, and that the charge was not sent for as a result of a controversy arising among the jurors upon the question whether they were authorized to consider the defectiveness of the harness, as alleged in the complaint, as one of the grounds upon which the plaintiff relied for a recovery.

As to the matter of sending the instructions to the jury, it is to be said that there is no law expressly authorizing such a course to be pursued in civil cases. Section 612 of the Code of Civil Procedure specifically states what papers or documents may and may not be taken to the jury-room by the jury; but that section does not say that the instructions given may be so taken, nor does it say that they may not be taken by the jury. The section neither expressly includes the instructions within the papers or documents which may be taken nor expressly includes them within those which are expressly excluded. In criminal cases, the court, by express authority of section 1137 of the Penal Code, may allow the jury to take the given instructions with them. Of course, there can be no doubt that, in civil cases, the court may, upon the express consent of both parties to the litigation, permit the jury to take with them to the jury-room the instructions

which have been read to them. There was, it is true, no express stipulation or consent by the attorneys in this case that the jury might be given the instructions, but upon the conflicting showing upon the question whether the attorneys for the defendants did know that the jury had made a request for the instructions and that the judge had complied with the request, the court below was justified in finding or at least amply supported in its finding that the attorneys on both sides had knowledge of those facts and an opportunity to register an objection to the giving of the instructions to the jury, if they had so willed. It is, however, very certain that, at all events, it cannot justly be said that, in point of fact, prejudice to either party could have followed from the fact that the jurors were given an opportunity to read, and that they did in fact read, the instructions which had been read to them by the court. It is to be conceded that the manner in which they were given the instructions was irregular, but it was only an irregularity, from which injury will not be presumed (Const., art. VI, sec. 4½; *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, [147 Pac. 238]), and there is no affirmative showing that the defendants were prejudiced by the proceeding complained of. What we here say is equally applicable to the complaint that the court omitted to send to the jury with the other instructions the reporter's transcription of the oral instruction above referred to. They made no special request for said instruction, and, obviously, if they examined those sent to them by the judge, they knew that there was no copy or report of the oral instruction sent to them.

We have now disposed of all the points urged for a reversal. The evidence, it may be admitted, is slight and not altogether satisfactory upon the question of the proximate cause of plaintiff's injuries, but, as above declared, there is some evidence that the proximate cause was the vicious nature of the mule, of which fact the defendants knew and the plaintiff did not, and under the rule governing reviewing courts on the question of the sufficiency or insufficiency of the evidence to support a verdict or findings, we do not feel at liberty to hold in this case that the verdict was without legal justification or is not sufficiently supported to preclude us from so declaring. It is true, as is to be expected, that the defendants presented testimony tending to show that

both the mule and the horse were perfectly gentle, but an appellate court cannot resolve conflicts in the evidence, but is only concerned with the question, so far as the evidence is concerned, whether there is to be found therein proof sufficient to support the verdict or findings.

The judgment appealed from is affirmed.

·Chipman, P. J., and Burnett, J., concurred.