[Civ. No. 2230. Fourth Appellate District.—April 17, 1939.]

J. R. DAY et al., Respondents, v. GENERAL PETROLEUM CORPORATION (a Corporation) et al., Appellants.

Chas. E. R. Fulcher and Borton, Petrini & Conron for Appellant General Petroleum Corporation.

Wayne Veatch for Appellant Kelly.

Ray W. Hays and Brittan & Mack for Appellants Shell Oil Company of California et al.

Claflin, Dorsey & Campbell for Respondents.

GRIFFIN, J.—This is an action commenced by the respondents Alice Day and her husband J. R. Day, against the appellants General Petroleum Corporation, Charles A. Kelly, Shell Oil Company of California, and J. E. Flacey, wherein the respondent, Alice Day, sought damages for personal injuries received by her as a result of an automobile accident, wherein it is alleged that such injuries proximately resulted from the carelessness and negligence of Charles A. Kelly and J. E. Flacey, the drivers of two separate vehicles. It is further alleged that General Petroleum Corporation is liable for said injuries by reason of the fact that Charles A. Kelly was, at such time and place, driving the truck as an employee of General Petroleum Corporation; that said truck at the time was in the control of said corporation; and that Shell Oil Company of California is liable by reason of the fact that J. E. Flacey was driving his automobile as an employee of the Shell Oil Company of California, and acting within the course and scope of his employment.

On October 28, 1937, the jury found a verdict in favor of the plaintiffs and respondents J. R. Day and Alice Day and against the General Petroleum Corporation, Charles A. Kelly, Shell Oil Company of California, and J. E. Flacey for the sum of $35,000, and also a verdict in favor of the respondent J. R. Day against the same defendants and appellants for the further sum of $7,708.73.

The General Petroleum Corporation admits in its brief that the evidence is sufficient to justify the jury in finding that Kelly, the driver of the truck, was guilty of negligence which was a proximate cause of the accident and injuries received

by respondent Alice Day and that she was not guilty of contributory negligence.

The points raised by the General Petroleum Corporation are confined to the questions pertaining solely to the liability of this appellant under the rule of *respondeat superior* and as owner of the truck.

Oildale is a town located north of the city of Bakersfield. Chester Street runs north and south through that town. Woodrow Avenue runs east and west through Oildale and intersects Chester Street. The accident happened at, or slightly north of this intersection. The termination of Woodrow Avenue is immediately in front of the Oildale school house, which is on the east side of North Chester Street. The 25-mile zone for the village of Oildale starts at the south side of Woodrow Avenue. Washington Street runs east and west through Oildale and intersects Chester Street one block south of Woodrow Avenue. The truck driver (appellant Kelly) resided at 526 Washington Street, several blocks west of Chester Street. North of Oildale are oil fields known as the Poso Creek field and others. The appellant General Petroleum Corporation had leases and wells in this field known as the Young lease, and others. The Young lease was the headquarters of appellant General Petroleum Corporation for this district. Southeast of Bakersfield is the Edison field in which is located the Osborne lease which was the General Petroleum Corporation's headquarters for that district.

On Sunday, May 24, 1936, at about the hour of 4 o'clock P. M., the appellant Kelly, an employee of the General Petroleum Corporation, was driving an empty truck, admittedly owned by that corporation, in a southerly direction on Chester Street in Oildale. Ahead of him, and traveling south, was a Ford automobile owned by appellant Shell Oil Company of California, and admittedly driven within the course and scope of his employment by J. E. Flacey, as an employee of that company. As the Shell car approached Woodrow Avenue, it suddenly slowed down or stopped, without the driver giving any warning or signal. Kelly, not having been warned of this act, applied his brakes, swerved to the left, struck the left rear of the Shell car, traveled easterly across the street, and struck the front of the car driven by respondent, Alice Day, who was traveling north, on the proper side of Chester

Street, with such force that the truck literally climbed on top of her car, causing the injuries which she suffered.

The injuries sustained may be summarized as follows: A compound fracture of the left humerus; a compound comminuted fracture of the left radius ulna; a simple comminuted fracture of the right wrist which, prior to the trial, had welded with a hump at the side of the fracture, which deformity will be permanent. From an examination of the X-rays the doctors reached a diagnosis of a fractured skull. Both ear drums were ruptured. There was a subjunctive hemorrhage of the left eye and a fracture of the left side nasal bone. At the time of trial, both ears were reduced in the amount of hearing, with the watch test, probably 10 or 15 per cent. The hearing, with a tuning fork, was reduced about 25 per cent. This will be permanent. The vision of the right eye was normal and the left eye reduced about 25–50 or 40 per cent below normal. The impaired vision in the left eye will be permanent. There was a four-inch cut on the scalp inside the hair-line. A puncture wound on the left arm pit left several scars. There was a four-inch cut from the top of the brow down around the outer aspect of the orbit which, prior to trial, had healed, leaving a scar on the left eye-lid. The left eye-lid now droops. The evidence indicates that prior to the accident Mrs. Day ''had two beautiful big brown eyes and her face was perfect, very nice looking woman''. The description of her after the accident and at the time of the trial was related as follows: ''Her face is very different. One eye looks much smaller than the other and droops, and the eye-brow looks drooped or drawn down and the entire side of the face to me looks smaller''.

There were various minor cuts along the left breast which left scars, and a seven-inch scar on the left thigh, together with minor cuts, bruises and lacerations. She suffered some sleeplessness and headaches, together with pains at the sites of the breaks of the arm and occasional periods of unawareness. These occasions of unawareness were described by one witness as follows: ''She was seeing things, talking out of her head, didn't know what she was doing for a period of an hour and a half.'' Three of these spells of unawareness occurred in a five-month period during the year 1936. Mrs. Day was in a hospital for about 14 weeks. Four weeks of this period she

was in an unconscious state. After her discharge from the hospital on the first occasion she returned for a further stay to have the left humerus reset.

The truck of the General Petroleum Corporation had been driven from the north part of North Chester Avenue probably a distance of about 11 miles to the point of the accident. It was a three and one-half ton White truck, weighing about 14,000 pounds. A steam railroad crosses North Chester Avenue at a point two or three blocks north of the scene of the accident. The White truck was driven for the last three miles of its trip north of the railroad mentioned at a speed of 35 to 40 miles per hour. The evidence seems to indicate that when it crossed the railroad track it decreased its speed to about 25 to 30 miles per hour. The Shell Oil Company Ford V-8, driven by Flacey, was driven on the open highway to the railroad crossing immediately in front of the truck at 35 to 45 miles per hour. Its driver, Mr. Flacey, testified that when he crossed the railroad tracks he gradually slowed down until he was traveling at 20 miles per hour and that when he slowed down he did not give any signal of intention to stop or of suddenly decreasing the speed of his car, and he further testified that he did not stop. When the Ford V-8 was struck by the White truck the Ford was going about 20 miles an hour. There were skid marks from the rear wheels of the truck, where it came to rest, extending from 50 to 60 feet, and terminating across the median line of the pavement on the west side of that line.

The facts in reference to the question of the scope of the employment of the driver Kelly and as to the permission of the employer to operate the truck at the time of the accident may be summarized as follows: Respondents in their complaint (paragraph V) allege: "That on the 24th day of May, 1936, at the place herein last above mentioned (scene of the accident) the defendant General Petroleum Corporation, a corporation, *was the owner of, and in the control of* a motor vehicle, to wit, a certain truck which was then and there being driven in a southerly direction by said defendant Charles A. Kelly, *its officer, servant and employee.*" There is no denial of these allegations and accordingly they stand admitted (*Hutson* v. *Gerson,* 132 Cal. App. 665, at 669 [23 Pac. (2d) 816]). The foreman at the various stations testi-

fied generally that it was the general instruction to employee drivers to garage or park their equipment at the place where they finished their work for the day, at the lease or wherever they were working, and that if an employee finished his day's work on the Young lease the truck should be left or parked on the Young lease; that appellant did not furnish transportation for its employees to and from work; that they furnished their own transportation and where it was necessary for them to travel more than 10 miles from Nineteenth and Chester Streets, in Bakersfield, in order to get to and from work, the company allowed them 50 cents per day.

On May 24, 1936, Kelly was assigned to the production department, Kern division, under the supervision of the foreman of production and subject to his orders. The Young lease is less than 12 miles from Nineteenth and Chester Streets and the Osborne lease is over 10 miles. Kelly's duties took him into the fields north of Bakersfield and south of Bakersfield. The foremen also testified that when a truck driver finished work in the Edison field he would finish at the Osborne lease, and if he should finish his work in the Poso Creek field he would return to the Young lease. This particular truck was to be where duty called it. It might be the Osborne or it might be the Young lease. Quitting time was 4 P. M. These foremen also testified that none of the truck drivers lived on the leases; that if a truck driver went in his automobile to work and started at the Osborne lease and left his car there and carried equipment to Mount Poso in the northern district where he finished his work, he should bring his car back to the Young lease; that "there is usually someone there he can ride home with. It is up to him to get home"; that the hours of employment of Kelly were 7 :30 A. M. to 4 P. M. and that they never authorized him to quit earlier.

The driver Kelly testified in relation to this matter that a day or two prior to May 24, 1936 (the date of the accident), he drove his personal car to the Osborne lease and on the evening before, he stopped at his home with the empty truck of the company and remained there that night. On the following day (6 :30 A. M.) he drove the truck to the Young lease and hauled drilling equipment most of the day on and about the Young lease; that he quit work and left early (3 :30 P. M.) because he had finished the hauling at the

Young lease. He testified further that no one authorized him to quit early or to take the truck to his home on this occasion. He stated that he intended to take the truck to his home on this particular evening. His home was located south and west of the scene of the accident, a few blocks off of the main highway leading from the Young lease to the Osborne lease.

■ Considering the first point raised by appellant General Petroleum Corporation, i. e., that the evidence is not sufficient to establish the fact that Kelly, the driver of the appellant's truck, was acting within the course and scope of his employment at the time of the accident, it is to be noted that it is an admitted fact that the truck involved was owned by and *"in the control of"* the appellant corporation at the time of the accident; that Kelly was an employee of that company at that time and that he was driving the truck. This appellant admits that such facts raise an inference (not a presumption) that he was so driving within the course and scope of his employment at the time of the accident, but contends that such inference was wholly dispelled by the uncontradicted evidence showing that he was not at such time acting within the course and scope of his employment and that where such evidence is so uncontradicted, the inference so arising as aforesaid, is wholly dispelled and there remains no question of fact for determination by the jury. (Citing *McWhirter* v. *Fuller*, 35 Cal. App. 288 [170 Pac. 417]; *Brown* v. *Chevrolet Motor Co.*, 39 Cal. App. 738 [179 Pac. 697]; *Maupin* v. *Solomon*, 41 Cal. App. 323 [183 Pac. 198]; *Gousse* v. *Lowe*, 41 Cal. App. 715 [183 Pac. 295]; *Engstrom* v. *Auburn Auto Sales Corp.*, 11 Cal. (2d) 64 [77 Pac. (2d) 1059].)

Respondents contend that from these facts, when considered together with other facts and circumstances in the case, an inference may be drawn sufficient to raise a conflict which justified the submission of the question to the jury, and that they have determined the matter adversely to this appellant.

In *Mathe* v. *White Auto Co.*, 108 Cal. App. 286 [291 Pac. 599], it was held that where the complaint alleges the ownership in the employer and that the driver of the motor vehicle was the employee of the owner, that such allegation raises the *presumption* that the employee was acting within the scope

of his employment. The court in that case said: "It is well settled that in cases of this kind, for injury or damage inflicted by an automobile, allegation and proof showing ownership of the automobile and operation by the owner's employee is sufficient to make out a *prima facie* case and raise a presumption that the employee acted within the scope of his employment." (Citing *Wagnitz* v. *Scharetg,* 89 Cal. App. 511 [265 Pac. 318]; *Hathaway* v. *Mathews,* 85 Cal. App. 31 [258 Pac. 712]; *Dierks* v. *Newsom,* 49 Cal. App. 789 [194 Pac. 518]; *McWhirter* v. *Fuller, supra; Frierson* v. *Pacific Gas etc. Co.,* 55 Cal. App. 397 [203 Pac. 788]; art. Automobiles, Cal. Jur. Supp. 284.)

It was held in *Grantham* v. *Ordway,* 40 Cal. App. 758 [182 Pac. 73] (quoting from the syllabus), that "where it is admitted that the automobile which struck the plaintiff belonged to the defendant employer and that the person driving was its employee, the presumption arises that such person was acting within the general scope of his authority; and such presumption is not destroyed as a matter of law by the testimony of such employee that he was acting on his personal business. The question of whether he was so acting becomes a question of fact for the jury to decide." It was further held that "In an action for damages for personal injuries received through being struck by an automobile driven by an employee of a corporation, proof of the ownership of the automobile by the corporation and its operation at the time of the accident by such employee establishes a *prima facie* case against the corporation; and where the testimony of such employee is not so convincing, or free from justifiable doubt, as to amount to an admission by the plaintiff, who offers his testimony in evidence, or to eliminate the *presumption* that such employee at the time of the collision was engaged upon the business of his employer, the trial court commits error in granting a nonsuit as to the corporation." (Italics ours.)

In *Bushnell* v. *Yoshika Tashiro,* 115 Cal. App. 563 [2 Pac. (2d) 550], the court held (also quoting from the syllabus) that "In an action for damages against an employer for personal injuries caused by the negligence of his employee while operating the employer's automobile, proof that the automobile belonged to the employer and at the time of the accident was being operated by the employee, raises an *infer-*

*ence* sufficient to establish a *prima facie* case that the automobile was being operated by the employee under the authority of the employer and within the scope of the employment, and the burden is then upon the defendant to overcome or dispel such inference by proof of facts to the contrary. . . . In such a case, such inference is not destroyed or overcome as a matter of law merely because it is contradicted by the testimony of the employee or of other witnesses produced on behalf of the defendants, but the issue remains one of fact for the determination of the jury for the reason that, as sole judges of the weight of the testimony and the credibility of the witnesses, the members of the jury are not bound to accept such testimony as true, but may, if not convinced thereby, reject any portion or the whole thereof. . . . In this action for damages for personal injuries sustained by a pedestrian when struck by an automobile truck owned by a laundry company and driven by its employee and co-defendant, the testimony of witnesses given in contradiction of the inference establishing a *prima facie* case of liability against the defendant employer did no more than create a conflict therewith, even though said testimony was not rebutted; and in such a case, the determination of the jury on that issue is conclusive on appeal.'' (Italics ours.)

The court also held in *Jessen* v. *Peterson, Nelson & Co.,* 18 Cal. App. 349 [123 Pac. 219], that the question of the *control of the vehicle* was a fact to be found by the trial court. The term ''in the control of'' in its broadest sense, means to exercise directing, governing or restraining power over. (*Byrne* v. *Drain,* 127 Cal. 663, 667 [60 Pac. 433].) The court held, in this respect, in *Jessen* v. *Peterson, Nelson & Co., supra,* that the ultimate finding of the court that the admitted fact, in connection with other facts, that the horse and buggy was at the time of the accident ''wholly in the possession and under the control of the defendant'', a corporation, was a sufficient finding of probative facts to support a declaration that the ultimate fact necessarily results therefrom, i. e., that the driver was acting within the scope of his authority.

These particular quoted facts were admitted by the pleadings in the instant case. Respondents duly objected to the reception of any evidence under the pleadings which would

bar the admission of ownership and control contained therein. This objection was overruled.

The Supreme Court of this state in *Engstrom* v. *Auburn Auto Sales Corp., supra,* has in a thorough and painstaking decision clarified the distinction between a presumption and an inference and has harmonized the rules applicable thereto. In some of the cases cited and relied on the courts have fallen into the all too prevalent error of using the terms ''presumption'' and ''inference'' interchangeably and synonymously, with a consequent confusion of the rules applicable thereto. It was therein stated that an inference is a permissive deduction from the evidence, while a presumption is a deduction directed to be drawn by law, and the rule governing the dispelling of an inference is materially different from that relating to the dispelling of a presumption. An inference is dispelled as a matter of law when it is rebutted by clear, positive and uncontradicted evidence which is not open to doubt even though such evidence is produced by the opposite side, but if the opposition evidence is conflicting, vague or uncertain, or is weakened by contradictions or improbabilities, the inference is not dispelled as a matter of law. Generally speaking, a presumption is dispelled when a fact which is wholly irreconcilable with it is proved by the uncontradicted testimony of the party relying on it or of such party's own witness when such testimony was not the product of mistake or inadvertence; but a presumption is not dispelled by evidence produced by the opposite party but remains as evidence in the case sufficient to support a judgment, except in rare cases in which the rebutting evidence is absolutely conclusive.

In addition to the admissions of the pleadings above related, i. e., that the petitioner corporation *was the owner of* and *in the control of* the truck at the time of the accident, we think the circumstances that should be considered are that Kelly drove his own car to the Osborne lease; that he took the company truck to the Young lease; that he finished his duties there; that he left early before quitting time at the Young lease; that he knew that it would be a violation of his orders to stop at his home unless the truck was loaded; that he was traveling at the speed indicated on a direct route to the Osborne lease. Could it not reasonably be inferred that he was returning to the Osborne lease to terminate his employment

for the day and secure his own automobile and return home, notwithstanding his testimony to the contrary? There is evidence displayed in the record which is indicative of the fact that the general attitude of the witness Kelly was more or less evasive. Immediately after the accident the driver, Charles A. Kelly, was interrogated by a traffic officer and Kelly stated to him that the sedan driven by the lady going north on Chester Avenue, when Kelly was driving the truck south on that avenue, came across the road, struck the left rear of a coupe just ahead of the truck, and then struck the truck head on. Also after the accident a Mr. and Mrs. Norman arrived at the scene of the accident and the driver Kelly came to their car when the Normans were ready to depart and inquired if they had seen the accident and they said they had. When he inquired as to whose fault it was, Mr. Norman said: "From the looks of things it was your fault" to which Mr. Kelly replied: "I don't think so." Mr. Norman then said: "Well, you hit the Shell car before you hit Mrs. Day," to which Kelly replied: "I never hit the Shell car." Mr. Norman said: "You did hit the Shell car" and Kelly replied: "Maybe I did." On taking Kelly's deposition, these questions were asked and the related answers were given. By Mr. Campbell: "Q. Did you see Mrs. Day's car at all that day? A. Yes. Q. Where was it when you first saw it? A. I refuse to answer." In a question propounded by Mr. Campbell at the trial the witness was asked: "And you refused to answer because you thought it might incriminate you? A. Yes, sir. Q. How did you think it was going to incriminate you if you said you saw the car, or didn't you remember? A. I was told not to answer. Q. By Mr. Hays: Why did you refuse to answer this question at the time your deposition was taken: 'How fast were you traveling when you crossed the railroad track?' A. Because it might tend to incriminate me."

It appears to us from an examination of the entire record that the court was justified in holding that the inference arising from the admissions in the pleadings and facts in evidence was not dispelled as a matter of law and that it was not rebutted by clear, positive and uncontradicted evidence not open to doubt; that a conflict of evidence arose sufficient in itself to submit the question for a determination by the jury.

Under the instructions given, the jury by its verdict has found that the driver was acting within the course and scope of his employment at the time of the accident. Under the authority of *Parsons* v. *Easton*, 184 Cal. 764 [195 Pac. 419], this finding cannot be disturbed.

█ Appellant Shell Oil Company admits in its brief that if the defendant and appellant Flacey was guilty of any act or omission constituting negligence on his part that had any causal connection with the injuries suffered by the respondents, then the appellant Shell Oil Company would be liable.

We must then examine the evidence with that admission in mind. The testimony of the witness and appellant Charles A. Kelly bearing on the question is as follows:

"Q. By Mr. Dorsey: Now as you approached the zone where the accident afterwards happened, did you notice or did you see in front of you a Ford automobile? A. No, sir. I seen a car, I couldn't say it was a Ford or what kind it was. Q. All right, you saw an automobile. A. Yes, sir. Q. Where were you when you saw that automobile with reference to the Standard School or any street there or anything? A. Well, I was following the traffic all down the road there. I never took no particular notice of the automobile, I just know there was traffic ahead of me. Q. And did you there at that point when you saw this car ahead of you, did you have any reason to stop, or attempt to stop on the pavement? A. Why, about that same instant that this accident took place, the traffic ahead of me, the car that was ahead of me there diminished speed suddenly or stopped, I don't know which. Q. All right, now what did you do when that occurred to you, that that car either decreased its speed or stopped, what did you do? A. I tried to stop. Q. What did you do? A. I applied all the brakes I had to stop. Q. You put on your brakes? A. Yes, sir. Q. Well, when you did that, when you say that car stopped in front of you or decreased its speed, whatever it was, did the occupant of that car, or the driver of that car give any warning that the car was about to stop or the speed decreased? A. No, sir. . . . Q. Mr. Kelly, did anything of—any object of any kind strike you at the time that you say you lost your memory there at the point you mentioned a while ago as you were approaching the car in front of you, did anything strike you, any object of any

kind? A. Just the sudden stop of the car in front of me, that is all. . . . Q. And as you were driving south on North Chester at about what distance were you following this car that was immediately ahead of you? A. I would judge about 75 feet, maybe more or less. Q. 75 feet more or less, and how fast was that car going in comparison with the speed of your car? A. I would say about the same. . . . Q. By Mr. Hayes: Q. Well, what is your best recollection now as to when you first saw this car that you say stopped or slowed down in front of you? A. I never paid any attention to the car or traffic until just before the emergency. Q. You hadn't paid any attention up to that time? A. Well, just to keep my distance from back of the traffic. Q. Then you had been watching it to keep your distance, had you? A. Why certainly, absolutely. Q. You haven't any idea to tell the jury for what distance you had been driving behind that car? A. I imagine I would be safe in saying a half a mile.''

It is quite apparent that the truck struck the left rear portion of the Shell Oil Company's Ford car. It must then follow that either the truck driver increased his speed to bring about such a collision or the Shell Oil Company Ford decreased its speed. There is no evidence that the truck driver accelerated his speed just before the happening of the accident. The only evidence relating to the question is the testimony above quoted and that of Flacey, the driver of the Ford, and his guest passenger, John A. Regan. Flacey testified as follows:

''Q. (By Mr. Petrini.) What speed had you been traveling before you came to Wilson Street, that is to say, the street just north of Woodrow Street? A. 20 miles an hour. Q. 20 miles an hour; and what speed had you been traveling as you came up to the railroad track? A. About 30. Q. And then what did you either accelerate your speed to or reduce your speed to? A. I just took my foot off the accelerator and slowed down gradually. Q. Mr. Flacey, then, at a point approximately 100 feet north of the intersection, you felt something that you thought was a flat tire, is that correct? A. Yes, sir. Q. Your idea then is, that 100 feet north of the intersection you felt something that led you to believe for the moment at least that it was a flat tire, is that correct?

A. Or had lost a wheel. Q. . . . Didn't you at that time slam on your brakes hard? A. No, sir."

Regan testified as follows:

Q. (By Mr. Hays) : What first directed your attention to the fact that something unusual had happened? A. Thought we had a flat tire. Q. What did you do when you thought that? A. I told Mr. Flacey 'I think we have got a flat tire'. Q. And then did you see anything unusual happen? A. Yes, sir. Q. What did you see? A. I looked out the window and saw a truck go to the left of us. Q. And up until the time when you felt this jar or flat tire, whatever it was, did he (Flacey) change his speed at all? A. No, sir. Q. That is, he didn't make any sudden stop or change in his speed? A. No, sir. Q. State whether or not, at the time you thought there was a flat tire, he slammed on his brakes? A. I have no recollection of his slamming on his brakes. Q. At any time? A. After he got hit and we thought he had a flat tire."

The broken red glass out of the tail-light of the Ford car was found about 100 feet north of the intersection. The appellants, Shell Oil Company and J. E. Flacey now argue and strenuously contend that the testimony of Kelly is entirely refuted and completely impeached and is not entitled to any credence and "does not rise to the standard of expression of truth"; that the driver, Flacey, gradually slowed down after he was struck and therefore there was no occasion for him to give any signal to any car on the highway behind him, because under section 544, paragraph (c) of the Vehicle Code, he was not required to give any signal for the reason that that section provided that "No persons shall stop or suddenly decrease the speed of a vehicle on a highway without first giving an appropriate signal in the manner provided in this chapter to the driver of any vehicle immediately to the rear when there is opportunity to give such signal".

Respondents maintain that the evidence above quoted is sufficient to generate a substantial conflict. After a study of the entire record, we are not of the opinion that the testimony of the witness Kelly bearing on this phase of the case should be rejected as untenable. Time and time again it has been held that where the evidence as to the circumstances of an accident is conflicting, or more than one conclusion can be

reasonably drawn therefrom, the question of whether the negligence of one driver or both was the proximate cause of the collision is one of fact to be determined by the jury, and if there be evidence to support such determination, it cannot be disturbed on appeal. (*Smith* v. *Schwartz,* 14 Cal. App. (2d) 160, 164 [57 Pac. (2d) 1386] ; *Dougherty* v. *Ellingson,* 97 Cal. App. 87 [275 Pac. 456] ; *Fishman* v. *Silva,* 116 Cal. App. 1 [2 Pac. (2d) 473] ; *Hill* v. *Peres,* 136 Cal. App. 132 [28 Pac. (2d) 946].)

It was said in *Hardin* v. *Sutherland,* 106 Cal. App. 473 [289 Pac. 900] :

"But we cannot say, in view of all the circumstances surrounding the accident, that had the driver of the Dodge car extended his hand as required by law at the instant when he saw that a reduction of speed was necessary, that the driver of the stage would not have had a more timely warning. We think that the question as to whether or not the failure of the driver of the Dodge car to extend his hand was a proximate cause of the accident is, like other questions of fact in this case, one to be determined by the court."

In *Forrest* v. *Fink,* 71 Cal. App. 34 [234 Pac. 860], the court approved an instruction given to the jury that it was the duty of a driver about to stop a motor vehicle, or to abruptly or suddenly check its speed, to extend his hand and arm as provided by law and that a failure so to do is *prima facie* evidence of negligence when an accident results. Under the conflicting evidence in that case it was held that the question of fact was properly left to the jury. To the same effect is *State Compensation Ins. Fund* v. *Jorn,* 186 Cal. 782 [200 Pac. 624]. ■ It has also been held generally that where a collision between two automobiles is proximately caused by the negligence of both drivers and results in injury to a third party, the injured party may recover from both or either driver, even though the negligence of one may have been greater than the negligence of the other. (*Smith* v. *Schwartz, supra; Jordan* v. *Great Western Motorways,* 213 Cal. 606 [2 Pac. (2d) 786].) ■ In order for one driver to establish that the independent negligence of the other was the sole proximate cause of the collision, it must appear that his own negligence was so disconnected in time and nature as to make it plain that the damage was not proximately caused by the

negligence of the one who is thus seeking to be relieved from liability. (*Springer* v. *Pacific Fruit Exchange*, 92 Cal. App. 732 [268 Pac. 951] ; *Fishman* v. *Silva, supra.*)

The jury, guided presumably by all the criteria by which the law says they must be governed in weighing evidence, decided the issue contrary to appellants' version. This court's duty begins and ends with the inquiry whether the trial court had .before it evidence upon which an unprejudiced mind might reasonably have reached the same conclusion which was reached. We therefore refrain from encroaching · on the proper function of the jury.

Appellants also contend that the trial court committed prejudicial error in instructing the jury, first in giving respondents' instruction number 36. The court instructed the jury that the admitted fact of ownership of the truck by the company, and that Kelly, the driver, was an employee at the time, gave rise to a *presumption* that he was acting within the general scope of his authority, and that this *presumption* was in itself a species of evidence and should prevail and control the jury's deliberation until it was overcome by satisfactory evidence. (Italics ours.) The respondents support this instruction by the language of *Wagnitz* v. *Scharetg, supra,* and other cases heretofore cited on the subject. In *Fahey* v. *Madden*, 56 Cal. App. 593 [206 Pac. 128], the appellate court affirmed an order granting a new trial based on the giving of a somewhat similar instruction. In support of this general contention of error *Pozzobon* v. *O'Donnell*, 1 Cal. App. (2d) 151 [36 Pac. (2d) 236] , *Kruse* v. *White Bros.*, 81 Cal. App. 86 [253 Pac. 178] , and *Maupin* v. *Solomon, supra,* are cited. As heretofore stated, the facts recited only give rise to an inference and not a presumption. (*Maupin* v. *Solomon, supra,* p. 326 (petition for hearing in Supreme Court denied) ; *Engstrom* v. *Auburn Auto Sales Corp., supra; Montanya* v. *Brown*, 31 Cal. App. (2d) 642 [84 Pac. (2d) 161].)

An instruction similar in principle to the criticized instruction, although erroneous in that the word "presumption" was used instead of "inference" was held not to be prejudicial in the recent case of *Mudrick* v. *Market Street Ry. Co.*, 11 Cal. (2d) 724 [81 Pac. (2d) 950, 118 A. L. R. 533], wherein the court said: "While courts have frequently called attention to the erroneous use of the terms 'presume' and 'presumption' in

stating the rule of *res ipsa loquitur,* no decision has been called to our attention in which a judgment has been reversed by reason of the erroneous use of these words. While it may be error, the error, in our opinion, has not prejudiced the defendants in any of their rights.'' We have reached the same conclusion as to the questioned instruction.

 We have carefully examined the remaining instructions against which the attack of appellants was directed. Some of them, although unhappily worded, when considered and read in the light of the other instructions given, are not prejudicially erroneous.

We have likewise carefully examined the proffered instructions of appellants which were refused by the court. The subject-matter thereof was properly given and substantially covered in other instructions. The court's refusal to give the requested instructions was not prejudicial error. (*Silvey* v. *Harm,* 120 Cal. App. 561, 575 [8 Pac. (2d) 570] ; *Haney* v. *Takakura,* 2 Cal. App. (2d) 1 [37 Pac. (2d) 170].) For a reversal to be ordered on account of errors committed in the giving or refusing of instructions to the jury, it must affirmatively appear, and the court must be affirmatively of the opinion that there has been a miscarriage of justice. It appears from the record that after the trial judge instructed the jury, and several hours after it retired for deliberation, the jurors requested that the written instructions given by the court be delivered to them in the jury room. The undenied affidavit of the clerk of the court reveals the following :

''W. Verle Freeman, being first duly sworn, deposes and says: That I am and at all the times herein mentioned was a deputy county clerk ; that I served as courtroom clerk throughout the entire trial of the above entitled cause ; that immediately after Judge Owen had read the instructions to the jury he left the bench and went into his chambers. I filed the instructions and stapled them together, then took them to the judge's chambers with the judge present, Allan B. Campbell, Senator Hays and Bailiff Sherrill ; James Petrini was standing in the doorway. I stated to the judge that I had the instructions ready and that they might be handed to the jury if they were requested. Thereupon the judge asked the parties present if it would be agreeable to give the instruc-

tions to the jury should they request same, to which Allan B. Campbell replied it would be agreeable to him as attorney for plaintiffs, and Senator Hays stated that whatever was the custom in Kern County courts would be agreeable with him, as attorney for Shell Oil Company and Kelly. James Petrini being in the doorway, made no remark or objection to the agreement. Later the Bailiff, without any further instructions, gave the instructions to the jury. I wasn't present at that time but I know this because the jury returned them to me later. The instructions so delivered to the jury by the Bailiff and returned to me by them as aforesaid, contained only the instructions read to the jury by the judge on the submission of the case to them without any change in them whatever."

Appellants contend that the incident recited was violative of not only the statutory but the constitutional rights of the appellants, citing *Nelson* v. *Southern Pac. Co.*, 8 Cal. (2d) 648, 655 [67 Pac. (2d) 682], wherein it is said: "Section 614 of the Code of Civil Procedure requires that, if the jury desire further instruction, it shall be conducted into court and the information desired given in the presence of or after notice to counsel. Any other method of communication is held to go to the substance of the right of trial by jury and because of its nature is deemed to be prejudicial except in very exceptional circumstances." (*Fererira* v. *Silvey,* 38 Cal. App. 346 [176 Pac. 371], *Little* v. *United States,* 73 Fed. (2d) 861 [96 A. L. R. 889], and *Smith* v. *McMillen,* 19 Ind. 391.) The fact that the jury was permitted to take to the jury room the written instructions under the circumstances here related cannot justly be said to be prejudicial. (*Fererira* v. *Silvey, supra; Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 Pac. 238] ; *Melikian* v. *Independent P. S. Co.*, 8 Cal. App. (2d) 166 [47 Pac. (2d) 539].)

█ Finally, we approach the all-important question pertaining to the amount of the award of damages. It is the earnest contention of appellants that the damages awarded were excessive and that from the facts recited this excess appears as a matter of law and at first blush suggests passion, prejudice or corruption on the part of the jury. While no particular attack is directed toward the award of $7,708.73 to J. R. Day for special damages and general consequential dam-

ages, yet when added to the general verdict of $35,000, it is claimed that the total reflects excessiveness.

In approaching this point, we do so with full knowledge of the law that there is no absolute rule established for determining whether or not a verdict is excessive. One means of measuring a verdict for the purpose of discovering whether or not it was influenced by passion or prejudice is by comparing the amount awarded with the evidence submitted to the trial court, since a declaration that the verdict was influenced by passion or prejudice is but one way of stating that the verdict exceeds any amount justified by the evidence. The Supreme Court has, in determining whether a judgment was excessive, compared verdicts in other cases which were factually similar to the instant case. (*Maede* v. *Oakland High School Dist.*, 212 Cal. 419 [298 Pac. 987].)

In *Rosander* v. *Market Street Ry. Co.*, 89 Cal. App. 721 [265 Pac. 541], a verdict in the sum of $35,000 was upheld. Plaintiff was a young married woman and the injuries were of a permanent character.

In *Rannard* v. *Harris*, 113 Cal. App. 15 [297 Pac. 623], a general verdict for the wife in the sum of $30,000, together with a special verdict in favor of the husband for $4,829.11, was held not to be excessive. The injuries sustained in the instant case are factually similar to those in *Rannard* v. *Harris, supra*. Other cases have been cited where the award was in excess of the amount of the award in the instant case. (*Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal. (2d) 480 [55 Pac. (2d) 870]; *Karberg* v. *Southern Pac. Co.*, 10 Cal. App. (2d) 234 [52 Pac. (2d) 285].)

We note that, due to illness, the judge who heard the motion for new trial was not the judge who tried the case before the jury. Appellants stress this fact in their argument and ask us to consider it in applying the general rule that "a view of the person so afflicted would be of great evidentiary value to a court or jury in fixing the compensation to be awarded. This is also true of the effect of the injuries upon the general health of the wife. Her general appearance and the manner in which she moved about the court room—all such matters have no adequate presentation in the record. It is for such reasons as these that our appellate courts have committed to the trial court or jury, the

practically exclusive function of fixing the amount of damages.'' (*Rannard* v. *Harris, supra*, p. 18.)

In view of the facts narrated, showing that the injuries received by Mrs. Alice Day were of a distressing and serious character, and showing also that a great amount of pain and suffering and permanent injury has been sustained by her, we cannot say, as a matter of law, that the verdict was excessive.

The judgment from which this appeal is perfected is affirmed.

Barnard, P. J., and Marks, J., concurred.

Petitions for a rehearing of this cause were denied by the District Court of Appeal on May 15, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 15, 1939. Edmonds, J., voted for a hearing. Houser, J., did not participate.