[Civ. No. 27280. Second Dist., Div. Four. Jan. 7, 1965.]

JOSEPH GRANONE et al., Plaintiffs and Respondents, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

634

Harold W. Kennedy, County Counsel, and Edward A. Nugent, Deputy County Counsel, for Defendants and Appellants.

Richards, Watson & Hemmerling, Clifford A. Hemmerling, John Butchko and Louis Lee Abbott for Plaintiffs and Respondents.

FRAMPTON, J. pro tem.*—Defendants County of Los Angeles and Los Angeles County Flood Control District appeal from a judgment entered against them, after trial by jury, in favor of plaintiffs, for damages in the sum of $77,000, with interest in the sum of $32,709.12 and costs in the sum of $10,186.75, or a total of $119,895.87.

Motions for judgment notwithstanding the verdict and for new trial were heard and denied. The appeal is from the judgment and from the order denying the motion for judgment notwithstanding the verdict or in the alternative for a new trial.

The record on appeal presents a transcript of the oral proceedings containing 6,481 pages and 296 exhibits includ-

---

*Assigned by Chairman of Judicial Council.

ing those offered for identification. The trial extended for a period of over three months.

The cause proceeded to trial on the second amended complaint, which contained four causes of action. The first, in substance, alleges that defendants designed and maintained public property in such manner as to cause it to be in a dangerous and defective condition. This cause of action as pleaded falls within the provisions of the statutes commonly referred to as the Public Liability Act. (Gov. Code, § 53050, et seq.) The second cause of action alleges the taking and damaging of plaintiffs' property without the payment of just compensation therefor within the meaning of article I, section 14, of the California Constitution, and sounds in inverse condemnation. The third cause of action alleges negligence in the construction and maintenance of the facility, and we treat it as an action under common law for negligence. The fourth cause of action alleges the maintenance of a nuisance caused by the negligent construction and maintenance of the facility. Stated very broadly, plaintiffs' claims, which underlie each cause of action, are that the defendants had installed at a point where Dominguez Channel passes under the intersection of 223rd Street and Wilmington Avenue (a point less than 2 miles downstream from plaintiffs' property) culverts defective in design, in that they had an unnecessarily high propensity to catch and hold debris which obstructed the flow of water. That both prior to, and at the time of, a major rainstorm, which occurred in January 1956, the defendants negligently maintained the channel, its levees and culverts, by failing to remove large quantities of debris which reasonably should have been anticipated would collect at the upstream side of the culverts and obstruct the flow of water. That the combined effect of the defective design and negligent maintenance caused a tremendous accumulation of debris thereby blocking the flow of water in the channel, causing the water to overflow the levees and onto adjacent lands including those of plaintiffs thereby damaging and destroying growing crops on such lands.

The evidence, viewed in the light most favorable to respondents,[1] discloses the following. Plaintiffs were lessees of

---

[1]We state the facts most favorable to the respondents, as we are required to do on appeal. We have read and considered the lengthy attacks by appellants on some of the evidence, but find them to be no more than the typical arguments over credibility and weight which should have been, and no doubt were, addressed to the jury and to the trial court and which the verdict and the order denying appellants' post-verdict motions show were rejected by them.

approximately 291 acres of land situated roughly in the northeast quadrant formed by the intersection of Avalon Boulevard and Dominguez Channel, having entered into possession of the land on or about July 25, 1954. At the time of the storm of January 1956 plaintiffs had growing crops on 205 acres of this land consisting of radishes, cabbages, beets, turnips, spinach and mustard.

Dominguez Channel above its intersection with 223rd Street and Wilmington Avenue services a watershed which at one time approximated 64 square miles and which, before the 1956 storm, had been reduced to 56 square miles. The watershed area includes the entire Gardena Valley, the cities of Gardena and Torrance, and portions of the City of Inglewood. The facilities here under consideration were situated at the bottom and in the southeast corner of this area. Storm waters from the greater part of the area would eventually flow into the channel and pass plaintiffs' property.

A more concise description of Dominguez Channel and the facility here involved is found in the statement of matters agreed upon at pretrial as follows: ''Dominguez Channel is a water drainage channel running in a generally Northwesterly to Southeasterly direction, and emptying into the Pacific Ocean near San Pedro, California. The channel is under the jurisdiction and control of the defendant Los Angeles County Flood Control District. By and large, roads crossing the Dominguez Channel do so over viaducts or bridges of varying types. However, some two miles below plaintiffs' land, Wilmington Boulevard and 223rd Street have their junction, where they respectively meet Dominguez Channel and at said point of juncture, the Channel is crossed by an earthen embankment which supports the streets and their intersection thereon. In order that the waters in the channel may flow through said earthen embankment, said embankment is pierced by six culverts, five of which are corrugated iron of an approximate diameter of nine (9') feet and the sixth of which is a concrete culvert seven (7) feet by seven (7) feet in aperture.''

Prior to 1941 the water carrying facility at the intersection of the above-named highways with Dominguez Channel consisted only of the concrete culvert, seven by seven feet in aperture as hereinabove described.

In 1941 both the county and flood control district combined with each other in the design, construction and financing of the work in widening, and deepening, the channel from a

point 1,200 feet south (east) of the Main Street bridge to the 223rd Street intersection so as to create a trapezoidal ditch having a bottom approximately 37½ feet in width with sides sloping outward at a 34-degree angle to the horizontal. The channel has a slope, between Avalon Boulevard and the 223rd Street intersection, of .03 feet per 100 feet. The excavated dirt was placed on the sides of the channel so as to create a wall of dirt of irregular thickness with elevations ranging from 13 feet to 16 feet above mean sea level. These walls were sometimes referred to in the evidence as ''spoil banks'' and sometimes as ''levees.''[2] The work performed in 1941 and 1942 included the addition of five 8-foot 9-inch corrugated metal culverts varying in length from approximately 75 to over 200 feet. These culverts were aligned to the course of the channel upstream and the bend immediately downstream of the intersection. This construction was completed in 1942 and no material changes or additions thereto were made up to the time of the storm of January 1956.

The evidence shows that, prior to 1941, the area in which plaintiffs' land was situated would become flooded to a greater or less extent depending upon the amount of precipitation and the time interval within which the rain fell. The land had a general reputation in the area of being a slough or area subject to flooding. The public works, above described, were completed some time in 1942. The evidence shows no overflow onto plaintiffs' land from storm waters until January of 1952, although there was a heavy storm recorded from January 21 to 23, 1943, which produced 5.50 inches of rainfall. While this storm produced runoff that inundated Avalon Boulevard in the vicinity of the Dominguez Channel, it did not inundate plaintiffs' land. This storm produced from 1¾ inches to 2 inches' less precipitation than the storm of January 1956. There was a storm recorded between January 15th to January 18, 1952, which produced an average of 5.6 inches of rainfall in the area. There was evidence of considerable debris in the channel, upstream of the 223rd Street intersection, during this storm—''crates and lumber and timber and all kinds of stuff.'' Plaintiffs' land, during this 1952 storm, was

---

[2]The parties have debated, at some length, whether the channel should be called a ''canal'' with ''levees,'' or a ''ditch'' with ''banks.'' The more formal nomenclature appears on the official maps of the area. However, we do not regard the matter as important—by any name, the channel was an artificially improved device to collect and direct surface waters; its walls, although formed in part as a convenient method for disposal of the soil excavated from the channel, also served, and were designed to serve, as a means of retaining water in the channel.

flooded to depths of 6 inches to 1 foot, and the then lessees' alfalfa crop was destroyed by such inundation. Nevertheless, in 1954, when the lease was acquired by plaintiffs, the land had the general reputation of being nonflooding.

The evidence showed a general pattern of flooding of plaintiffs' land by storm waters prior to the construction of the public works in 1941-1942. Thereafter, until 1956, a period of 14 years, with the exception of the storm of January 1952, there was a general pattern of freedom from flooding by the elements. To paraphrase it in appellants' language, "[a]lthough changes in the culture (man-made works) occurred during these years, it appears the uses of the Granone land and environs remained farming and pasture and that basic topography and runoff remained unchanged for the watershed from *before* the 1941-1942 public works to 1956 save for the enhanced water relief those works afforded the area."

Coming now to the 1956 storm, the results of which triggered this litigation, the record discloses the following. Precipitation commenced on January 24, 1956, with .08 of an inch recorded at the Inglewood Fire Station for the 24-hour period ending on the 24th, 1.96 inches for the 24-hour period ending on the 25th, 5.34 inches for the 24-hour period ending on the 26th and .3 of an inch for the remainder of the storm, which ended on the 27th—making a total of 7.68 inches of rainfall within a period of four days, most of which fell on the third day of the storm. The amount of rainfall recorded for this storm varied in some degree depending upon the location of the recording station within the watershed. The recorded precipitation at the Inglewood Fire Station for the 1952 storm was 7.60 inches.

On Thursday, January 26th, Mr. Mansfield, road maintenance superintendent for appellant County of Los Angeles, assigned to the area here involved, who had been in the employ of the county for approximately 28 years, visited the intersection of 223rd Street and the Dominguez Channel where the public works here under consideration were situated. He observed the water in the channel at the upstream end of the culverts to be probably half way up the opening of the culverts, and the water on the downstream side at about the same elevation. He further testified that there was some debris, extending maybe 10 feet upstream from the culverts. This debris, as he described it, was not matted or highly congested at the culverts; it did not extend the full width of

the channel, but was swirling about in front of possibly two of the pipes and was passing on through.

Plaintiff Granone testified that he observed his property on the morning of January 27th and "the field was an ocean, absolutely covered all the way across," that when he had left the evening before there was no water on his land except for "natural rain puddles here and there which will accumulate." That on the 27th all he could see was water; he could not get onto his ranch. He stood at a position on Perry Street, where his tractor sheds were located, and, with the aid of field glasses, observed a break in the bank of the channel extending southerly of a point where some pipelines crossed. This break was about 20 to 25 feet in length. Later on in the same day, Mr. Granone again observed the same area and noted that the break had enlarged to a point northerly of the pipelines, and the break in the bank of the channel at this time was 75 to 80 feet in length. Water and debris from the channel were pouring through this aperture and onto his land. This break was located approximately 2,400 feet upstream of the intersection of Avalon Boulevard and Dominguez Channel and at a point where the Shell pipeline bridge crossed the channel.[3]

As the runoff from this storm built up, the following condition at the upstream side of the culverts developed. As described by witness Blagg, who at the time was an employee of and on duty with the Los Angeles County Sanitation District, he could see the channel from the Davison city plant. He remembered it started raining Wednesday evening and the water started coming up in the channel. As it rained more and more, water came up gradually. He had the day off on Thursday. When he returned on Friday, at about 10 a.m., the channel was filled up with debris and water. The debris consisted of "everything in there that you could almost think of. It was timbers of all kinds, it was 2 by 4s, and it was sheeting, 1 by 6, and it was timbers, was large as even 2 by 12s, and I would say about 10-foot long, and there was railroad ties, and it was just a little bit of everything in there. There was crates and packing boxes and everything you could think of.

<hr />

[3]Shell Oil Company, who maintained a pipeline crossing over the channel upstream from plaintiffs' land, and the City of Los Angeles, Department of Water and Power, who had installed and maintained a power transmission line tower adjacent to the channel at Avalon Boulevard, and who were joined as codefendants, successfully defended against liability and are not parties to the instant appeal.

"Q. Could you tell how far back that debris extended? A. Well, that debris kept accumulating there all the time as it extended back, and if I remember rightly, in my opinion, just judging distance, it extended back about 300 feet back up the Channel.

"Q. Well, now, back from what? A. Back from the eddy wall there, the culverts.

"Q. Now, was the debris all the way across the Channel or was it just partially across? A. All the way across, yes, complete.

"Q. Was that debris you saw on Friday, the 27th, solid or was it floating or loose? A. Well, right up next to the Channel, that debris was solid. Back farther, farther back you got, why, it was floating material back there. But right up next to the mouth of the opening of the Channel, that stuff was turned in like this and this and everything, it was just solid in there."

The witness further testified that, when he arrived at his post of duty on Friday there was still a little of the arch of one culvert showing above the water, but it kept building up. On the following Saturday the arch was completely covered, and the water was within 1 foot of the top of the concrete wall over the arch, and the debris continued to pile up more and more. The debris at the upstream side of the culverts was clogging and impeding the progress of the water through the pipes. There was no equipment there until the following Monday when a dragline commenced to remove the debris. As soon as the dragline started the removal of the debris, the water started flowing through the culverts.

The witness Machado, a farmer in the area, described the debris as consisting of timbers, planks, crates, rabbit hutches, tires, weeds and "whatever you . . .," and that it extended 300 to 400 feet upstream from the culverts, bank to bank.

The storm waters which escaped the channel and overran plaintiffs' land inundated it to an average depth of 5 feet.

The witness Burke, who was a licensed civil engineer and an assistant division head to the division head in the hydraulic division of the appellant district, when asked if he had seen debris in the Dominguez Channel, replied that from 1935 to the present date (December 7, 1961), any time he crossed the channel there would be evidence of debris in it. That pieces of debris which were longer than the diameter of the culvert could lodge crossways of the opening of the culvert. For some

time before January of 1956 there was a problem of people using the flood control channel as dumps. According to plaintiffs' expert it was good engineering and flood control practice to keep flood control channels clear of debris on a regular or periodic basis.

The witness Mansfield, who was road maintenance superintendent for the road department of appellant county testified that, while his department cleaned all culverts twice a year, he could not give a date when any particular culvert was cleaned, but he would say that the culverts at Avalon Boulevard and the channel were last cleaned in December 1955.

The witness Calas testified that he had lived in the area since 1931 and was familiar with it. He was a retired businessman and owned property in the area. That he was president of the Chamber of Commerce of the City of Torrance for the past six years. He testified further that each year for the past 10 or 12 years there had been correspondence between the Chamber of Commerce and the defendant flood control district on the subject of the condition and maintenance of the channel, advising them to keep men available during the rainy season. He testified further that ''[t]hey were there to,'' but during the 1956 storm he could not recall the area at 223rd Street where it crosses the channel or whether the district did anything to keep it open.

Plaintiffs' expert witness, a consulting civil engineer of many years' experience, testified that he had made an investigation of the circumstances of the January 1956 flood. In this connection, he made a very detailed examination from an engineering standpoint, to determine whether the 223rd Street facility was constructed in accordance with the proper engineering practice. He testified further than in his opinion it was not so constructed and gave his reasons as follows: ''[N]umber one is that the Channel as straightened out and the facilities that were installed, including the existing concrete box section, are not lined up with the flow line of the Channel. As I have stated before, they make an angle of between 15 and 25 degrees with the flow line, or what we call the line of columnation of the culverts and the concrete facility. Furthermore, the pipe which were installed have sharp edges on the upper side, when I say sharp, I mean they are metal, but they have edges which tend to catch any debris that might be floating that would catch on those corners and start to clog. They are not in line. By that, they

are not at right angles to the flow line either in that they are staggered at various heights or various distances upstream and downstream from each other so that where material might start clogging on one, where the three, especially on the south side that are close together, and the two on the north side that are also close together, the tendency is for material to catch on the edges between the two parts and clog those pipes as one touches and wraps around the other and continues down. Furthermore, the facility as it exists at that location does not have any protection there from the accumulation of debris or floating material to protect it or send it off from this, what we call, staggered bunch of tubes or staggered group of tubes. The head wall and wing walls of the concrete structure, the original structure, in the middle, does form a section that fairly channels the water into its location but that section does not start to operate until the water gets at about four and a half feet high in the Channel. In other words, the invert of that is about two and a half feet above the bottom invert, or the bottom of the pipes that were parallel to it, so it doesn't start operating until sometime after the other pipes, that is, the metal pipes start operating and as the water rises in the Channel and the floatable material comes down. In coming straight downstream, with this pipe facility, these pipe facilities at an angle there, as the material floats down, as it approaches the pipe, because there is a constriction in the Channel, that is, the pipes themselves, the velocity tends to increase there under normal conditions, it forms what we call a Ventura [sic] meter and the tendency is for a swirling effect so that floatable material coming down towards the barrel of these culverts tends to turn to the side and hang up on these edges and that's the three principal objections to this type of installation. It's a makeshift, very makeshift installation.''

He testified further than more openings would carry away more water and floatable material faster. That division of the cross-sectional area into six small culverts as contrasted with two larger openings of a typical double span bridge, increased frictional loss and further reduced water carrying capacity, and that the unusual length of the culverts further increased the frictional loss and thus decreased the water carrying capacity of the facility.

He further testified that, without consideration of the debris factor, and under conditions of the 1956 storm, the open channel in the vicinity of the 223rd Street facility would

have carried a minimum of 10,000 cubic feet per second (c.f.s.) of water. A double span bridge, at the same location, would have carried at least 6,000 c.f.s., and the culverts actually in place, if no debris blockage had in fact occurred, would have carried approximately 4,000 c.f.s. He further testified that the facility as constructed and maintained constituted a bottleneck for over 56 square miles of watershed and that it was a known trap. That after January 25th a crew of men should have been stationed there with a crane and other proper equipment to keep the facility open. Had the culverts not been blocked by debris the plaintiffs' property would have been free of flood water except that which would have backed up and remained in the ditches on Avalon Boulevard.

The maximum rainfall fell between the hours of 5:30 a.m. and 7:30 a. m. on January 26th. According to Mr. Granone's observation made as late at 3, 4 or 5 p.m. on January 26th, some several hours after the period of maximum precipitation, his land was not flooded. The witness Mansfield, whose duty it was to supervise and direct the cleaning of culverts, was present at the 223rd Street installation on January 26th. In the opinion of plaintiffs' expert, the failure to have equipment available on January 26th to remove debris in the course of the storm was a prime cause of the flooding of plaintiffs' land.

At the point where the levee broke, there was a pipeline bridge (Shell pipeline) constructed in such manner as to create a severe acute angle at the point where the bridge contacted the northwest levee of the channel. This bridge was built and maintained pursuant to a permit issued by the appellant flood control district. In the course of the 1956 storm, water arose above the bottom of the pipeline bridge and was diverted into the narrow angle above described causing undue erosion at this point. Floating debris in the water slid across the bridge to the point of the acute angle thus causing further erosion of the levee. That the water level at the point where the pipeline crossed the channel was caused to rise as a result of the clogging which occurred at the facility at 223rd Street and Wilmington Avenue. In the opinion of plaintiffs' expert witness, it was not in accordance with good engineering practice to construct such a bridge in the manner shown and under the conditions existing over the flood control channel. The break in the levee at this point was shown to be about 40 feet in length and 5 feet in depth.

In the opinion of plaintiffs' expert the construction and maintenance of the channel pipeline across the Dominguez Channel, with insufficient height between the pipeline bridge and the bottom of the channel, with the angle made with the channel and the fact that the pipes pierced the levees, was a proximate cause of the flooding of plaintiffs' land.

Appellants assert nine grounds upon which they rely for reversal. We will take them up in the order of their presentation.

I

They urge that no property right of plaintiffs was invaded and, accordingly, appellants are not liable to plaintiffs on any theory of law.

■ The taking or damaging of private property without compensation first being paid is in the field of tortious action. (*Douglass* v. *City of Los Angeles,* 5 Cal.2d 123, 128 [53 P.2d 353].) Its earliest application is to be found in the traditional trespass action. (*Frustuck* v. *City of Fairfax,* 212 Cal.App.2d 345, 364 [28 Cal.Rptr. 357].) ■ Where a state has not followed the constitutional procedure which requires the payment of just compensation before private property is taken or damaged (Cal. Const., art. I, § 14) an action will lie against the state to recover the value of the property so taken or damaged. This action is sometimes designated a proceeding in inverse condemnation. ■ Section 14, however, is designed not to create new causes of action but only to give the private property owner a remedy he would not otherwise have against the state for the unlawful dispossession, destruction or damage of his property. The state is, therefore, not liable under this provision for property damage that is *damnum absque injuria* and if the property owner would have no cause of action against a private citizen on the same facts, he can have no claim for compensation against the state under section 14. The effect of section 14 is to waive the immunity of the state where private property is taken or damaged for public purposes. (*Bauer* v. *County of Ventura,* 45 Cal.2d 276, 282-283 [289 P.2d 1].) This liability is imposed by the Constitution and not by statute. (*Douglass* v. *City of Los Angeles, supra.*)

■ The taking of property within the meaning of section 14 of article I includes an act which permanently or temporarily deprives an owner of the property's use (*Pacific Telephone etc. Co.* v. *Eshleman,* 166 Cal. 640, 664 [137 P. 1119, Ann. Cas. 1915C 822, 50 L.R.A. N.S. 652]), and the damaging

of property includes any substantial impairment thereof (*People* v. *Ricciardi*, 23 Cal.2d 390, 397 [144 P.2d 799]).

██ Where private property is taken or damaged as a result of a plan of construction or maintenance adopted by a county or flood control district for a storm drainage or flood control project, then a taking or a damaging for a public use occurs, and the fact that the interest affected is a leasehold, as distinguished from an ownership in fee simple, is immaterial. A tenant of land, whose leasehold interest therein has been damaged, is as much entitled to recover for his loss or injury as is the owner of the land. (*Ward Concrete Co.* v. *Los Angeles County Flood etc. Dist.*, 149 Cal.App.2d 840 [309 P.2d 546].)

██ If a natural watercourse is obstructed or diverted, the party responsible therefor is liable for the resultant damage to property. Similarly, when water is diverted out of its natural channel, the party responsible therefor is liable for the resultant damage to the property of others, absent the necessity of protecting one's property in time of peril under the common enemy doctrine.[4] (*Clement* v. *State Reclamation Board*, 35 Cal.2d 628, 636 [226 P.2d 817]; *Dick* v. *City of Los Angeles*, 34 Cal.App. 724, 729-730 [168 P. 703].)

██ It is generally recognized that one who makes substantial expenditures in reliance on long continued diversion of water by another has the right to have the diversion continued if his investment would otherwise be destroyed. (*Natural Soda Products Co.* v. *City of Los Angeles*, 23 Cal.2d 193, 197 [143 P.2d 12].)

██ It is also recognized that those with lands riparian to a changed channel have a right that such channel may not be returned to its former bed. (*Chowchilla Farms, Inc.* v. *Martin*, 219 Cal. 1 [25 P.2d 435].)

██ It has also been held that the rights of those who improve land previously submerged would be infringed if the land were submerged again. (*Matheson* v. *Ward*, 24 Wash. 407 [64 P. 520, 85 Am.St.Rep.]; 88 A.L.R. 142 et seq.)

██ In the case at bench, prior to the construction of the public works in 1941-1942, plaintiffs' land was subject to flooding during winter storms. After construction, and for a period of 14 years, with the exception of the 1952 storm when (as in 1956) debris was present in the channel, plaintiffs' land was free from flooding. Plaintiffs had farmed the land and

---

[4]There is nothing in this record to suggest that the "common enemy" doctrine was, in any way, applicable.

invested large sums of money in growing crops, in reliance upon the ability of the public works to contain the storm waters within the channel.

It may be conceded that the defendants were under no legal obligation to build such a facility. The fact remains, however, that they did build it and, under the circumstances, they owed the duty to plaintiffs to exercise ordinary care in its planning, construction and maintenance, to the end that it would be reasonably safe for the purposes for which it was intended, that is, to keep the land adjacent to the channel free from flooding in times of winter storm. (*Hayashi* v. *Alameda County Flood Control*, 167 Cal.App.2d 584, 589-591 [334 P.2d 1048].)

 The evidence discloses in the instant case that the public improvement was not planned and constructed in accordance with good engineering practices, and that after its construction, it was maintained in a negligent manner. The evidence further shows that the defective plan and construction, coupled with its negligent maintenance, was a proximate cause of the flooding of plaintiffs' land and the destruction of the crops growing thereon. In addition to this, plaintiffs in reliance upon the integrity of the public works to contain flood waters within the channel, as had been the case for a period of 14 years with the one exception above noted, had invested substantial sums of money in farming the land. Under these circumstances and the law applicable thereto, we believe that a property right of plaintiffs was invaded, that defendants are liable for the resulting damage, and that plaintiffs may pursue their remedy in an action in inverse condemnation.

## II

Appellants next assert that ''[n]o property of respondents having been taken or damaged by appellants for public use appellants are not liable to respondents in inverse condemnation.''

To state appellants' position succinctly, under this point, as we understand it, they claim that the waters from the 1956 storm would have flooded plaintiffs' land in the absence of the improvement of 1941-1942 and, this being so, there was no diversion of water from the channel, therefore, the construction of the improvement was not the proximate cause of plaintiffs' damage.

 This principle is well recognized and is stated as follows by the Supreme Court of the United States. ''If major

floods may sometime in the future overrun the river's banks despite—not because of—the Government's best efforts, the Government has not taken respondent's property. And this is true, although other property may be the beneficiary of the project. The Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted; and the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all." (*United States* v. *Sponenbarger*, 308 U.S. 256 [60 S.Ct. 225, 84 L.Ed. 230, 238].) This principle was recognized and applied in the case of *Youngblood* v. *Los Angeles County Flood Control Dist.*, 56 Cal.2d 603, 610-611 [15 Cal.Rptr. 904, 364 P.2d 840], cited and relied upon by appellants.

In *Youngblood*, however, the court further stated, at page 607, that: "Certainly the defendant is liable for a taking or damaging of land if it constructs a watercourse for a public purpose in a negligent manner and such construction is a proximate cause of the property owner's loss. And where the maintenance or operation of an improvement was faulty in the sense of a 'failure to appreciate the probability that, functioning as deliberately conceived' a damaging or appropriation would result, as distinguished from 'negligence in the routine operation having no relation to the function of the project as conceived,' it has heretofore been held actionable within article I, section 14 of the Constitution. (*Bauer* v. *County of Ventura*, *supra*, 45 Cal.2d 276, 286; cf. *Muskopf* v. *Corning Hospital Dist.*, 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457].) Also, when waters are diverted by a public improvement from a natural watercourse onto adjoining lands the agency is liable for the damage to or appropriation of such lands where such diversion was the necessary or probable result even though no negligence could be attributed to the installation of the improvement. (*Clement* v. *State Reclamation Board*, 35 Cal.2d 628 [226 P.2d 897]; *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 [153 P.2d 950].)"

Plaintiffs' expert testified that, had the culverts not been blocked by the debris, the waters of the 1956 storm would have passed through them and plaintiffs' land would not have been flooded. There was sufficient evidence before the jury to support its implied determination that plaintiffs' land would not have been flooded except for the defective design and negligent maintenance of the public improvement. We

may not arbitrarily disregard the jury's finding and hold that plaintiffs' land would have been flooded whether the improvement had been constructed or not. The finding of the jury takes the case out of the rule of law which appellants would have us apply here.

## III

Appellants' next contention is that "[c]ommon law negligence liability is not sustainable against appellants where the requirements of proximate cause and breach of duty are not made out in the evidence." They set out these requirements as: "(1) The legal duty to use due care; (2) a breach of that legal duty; and (3) that such breach is the proximate or legal cause of the resulting injury." It seems elemental that such requirements must be met before liability may attach.

 As to the first requirement, the law provides as follows: "Ordinarily a municipal corporation has no duty to keep a stream flowing in a safe condition or to protect private property from overflow, but if it assumes to act, it is liable to the same extent as any other volunteer. It must act without negligence." (*City of Tucson* v. *Koerber,* 82 Ariz. 347, 350 [313 P.2d 411]; *Hayashi* v. *Alameda County Flood Control, supra,* 167 Cal.App.2d 584.) A duty of care may arise from a voluntary undertaking, since one who affirmatively assumes a duty, though a mere volunteer, must use reasonable care in discharging it. (35 Cal.Jur.2d, Negligence, § 14 and cases cited.) One who has artificially changed the condition of a watercourse has a continuing duty to maintain that diversion or changed condition of a watercourse within the reasonable capacity of its system which effected the change. (*People* v. *City of Los Angeles,* 34 Cal.2d 695, 697-698 [214 P.2d 1]; *Natural Soda Products Co.* v. *City of Los Angeles, supra,* 23 Cal.2d 193, 197.)

 As to the second and third requirements, the evidence shows that the public works here involved were not planned and constructed in accordance with good engineering standards and that they were negligently maintained. The testimony was to the effect that the defect in the plan and construction, coupled with the negligent maintenance thereof, was the proximate cause of the flood water breaching the banks of the channel and damaging the crops growing on plaintiffs' land. It would seem, therefore, that all three of the requirements necessary to impose liability have been established.

## IV

Appellants' next contention is that "[n]uisance liability is

not present since the acts complained of do not interfere with any existing property right of respondents and, considered as a whole, benefited the complainants.'' This seems to be a combination of appellants' first, second and third points, with the added claim that ''[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance,'' citing Civil Code, section 3482.

A nuisance is defined as ''[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway. . . .'' (Civ. Code, § 3479.)

We believe it has been demonstrated that the acts complained of did interfere with an existing property right in the plaintiffs, and that such acts did not benefit plaintiffs, but on the contrary caused the damage of which the plaintiffs complain.

It has been held that where a bridge over a watercourse was negligently constructed, resulting in the accumulation of debris, thus clogging up the waterway and causing the water to overflow and destroy plaintiff's orange trees, the building of such bridge by defendant became a nuisance when, by reason of its faulty construction, it diverted the storm waters and debris from the usual channel and upon the plaintiff's land. (*Brush* v. *Southern Pac. Co.*, 47 Cal.App. 54 [190 P. 216].) Where the defendant municipal corporation had wrongfully diverted water upon the property of the plaintiff, it was held that such conduct constituted a nuisance, even though the acts of the city were done pursuant to statute. (*Los Angeles Brick etc. Co.* v. *City of Los Angeles*, 60 Cal. App.2d 478, 485-486 [141 P.2d 46].)

A sanitary district was held liable for maintaining a nuisance where it negligently permitted sewage to overflow from its pipeline onto plaintiff's land, thus flooding it with sewage and destroying a celery crop growing thereon. In affirming the judgment the court said: ''. . . a municipality may be held liable for creating and maintaining a nuisance notwithstanding a governmental activity is involved. [Citing cases.]'' (*Ambrosini* v. *Alisal Sanitary Dist.*, 154 Cal.App.2d 720, 726 [317 P.2d 33].) This case would seem to be authority for the proposition that a single act of flooding resulting in the destruction of crops constitutes a nuisance.

■ We are satisfied, under the facts of this case, and the law, that plaintiffs' cause of action for damages under a nuisance theory is an appropriate remedy.

### V

Appellants next urge that "[n]o Public Liability Act liability is imposable on appellants where the statutory requisite of a defective or dangerous condition of public property is not made out in the evidence."

■ The Public Liability Act as it existed at the time the cause of action arose provided as follows: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition." (See Gov. Code, § 53051.)

The cause of action under Government Code, section 53051, is essentially one in negligence. ■ Where the authorities who have planned and constructed an improvement have knowledge of circumstances which reasonably might be expected to result in a dangerous condition as a natural and probable consequence of the work, such authorities are put upon inquiry, and it follows that it is incumbent upon them to make inspections commensurate in scope with the nature and character of their knowledge and the peril which should be avoided. (*Fackrell* v. *City of San Diego*, 26 Cal.2d 196, 206 [157 P.2d 625, 158 A.L.R. 773]; *Duran* v. *Gibson*, 180 Cal.App.2d 753, 759 [4 Cal.Rptr. 803].) ■ As to what constitutes a dangerous or defective condition, no hard-and-fast rule can be laid down but each case must depend upon its own facts, and whether a given set of circumstances creates a dangerous or defective condition is primarily a question of fact. (*Fackrell* v. *City of San Diego*, supra; *Sandstoe* v. *Atchison T. & S. F. Ry. Co.*, 28 Cal.App.2d 215, 218 [82 P.2d 216]; *George* v. *City of Los Angeles*, 11 Cal.2d 303, 311-312 [79 P.2d 723].)

■ The condition of the public property may be rendered dangerous, within the meaning of the Public Liability Act, by the use or general plan of operation as well as by a

structural defect. (*Teilhet* v. *County of Santa Clara,* 149 Cal.App.2d 305, 307 [308 P.2d 356].)

It is well settled that when a public improvement has been planned by the governing body of a public agency and has been constructed in accordance with such plan, and when it is shown that by carrying out the plan a dangerous or defective condition has been created, no further proof is needed to charge the public agency with notice of that condition and the statutory requirement of notice under the Public Liability Act, has been met. (*McAtee* v. *City of Marysville,* 111 Cal.App.2d 507, 511 [244 P.2d 936].)

In the instant case, the evidence discloses that the facility was constructed in such manner as to cause it to collect large quantities of debris which in turn caused the water in the channel to back up and overflow the levee thus flooding the neighboring land. In addition, the evidence discloses that the appellant County of Los Angeles had actual knowledge of this condition gained from the 1952 storm. There is also evidence in the record that appellants' employees were aware that, for many years prior to the 1956 storm, large quantities of debris were constantly being dumped, by the public, in the channel upstream of the facility, and it was reasonably foreseeable that such debris would be carried downstream and would clog the entrance to the culverts thus causing the water to back up and overflow the banks of the channel. While the record discloses that appellants made some effort to clean out the culverts, except at the time of and during the 1956 storm, the record is bare of any testimony to the effect that the channel was kept reasonably free of debris known to have been deposited therein from time to time by the general public.

We believe there was ample evidence in the record to sustain the jury's finding that the appellant County of Los Angeles maintained a public works in a dangerous or defective condition, that the county had knowledge of such condition and failed for a reasonable time after acquiring knowledge to remedy the condition, or to take action reasonably necessary to protect the plaintiffs against the condition, and that such condition was a proximate cause of plaintiffs' damage.

## VI

Appellants next urge that "[a]ppellant-district, irrespective of the evidence, is not liable to respondents on any theory embodying the Public Liability Act or on any theory embody-

ing common law negligence. Appellant-county is not liable to respondents on any theory involving common law negligence.''

■ The appellant Los Angeles County Flood Control District is not "a local agency" as defined in the Public Liability Act. (Gov. Code, § 53050; *Barlow* v. *Los Angeles County Flood etc. Dist.*, 96 Cal.App.2d 979, 982 [216 P.2d 903].) It follows, therefore, that a cause of action under the Public Liability Act may not be maintained against the appellant Los Angeles County Flood Control District, and it was error to proceed to trial on this cause of action as against the district.

■ The pleadings set forth a cause of action based upon common law negligence and the evidence is sufficient upon which the jury could have found the appellants were negligent in the planning, construction and maintenance of the public works, and that such negligence was a proximate cause of plaintiffs' damage.

The question remains then as to whether the court should have proceeded to trial on this cause of action in view of the provisions of section 22.3 of the Civil Code, which provides in part as follows: ''The doctrine of governmental immunity from tort liability is hereby re-enacted as a rule of decision in the courts of this State, and shall be applicable to all matters and all governmental entities in the same manner and to the same extent that it was applied in this State on January 1, 1961. This section shall apply to matters arising prior to its effective date as well as to those arising on and after such date.

''As used in this section, the doctrine of 'governmental immunity from tort liability' means that form of the doctrine which was adopted by statute in this State in 1850 as part of the common law of England, subject to any modifications made by laws heretofore or hereafter enacted and including the interpretations of that doctrine by the appellate courts of this State in decisions rendered on or before January 1, 1961.'' (Adopted by Stats. 1961, ch. 1404, § 1.)

Section 3 of the act provides ''Section 1 of this act shall remain in effect until the 91st day after the final adjournment of the 1963 Regular Session of the Legislature, and shall have no force or effect on and after that date.'' (Stats. 1961, ch. 1404.)

The trial of the within action commenced on October 30, 1961, well within the period designated in the statute. In January 1961 the Supreme Court had swept aside the old concept of governmental immunity from liability for torts for

which agents of the public entity were liable. (*Muskopf* v. *Corning Hospital Dist., supra,* 55 Cal.2d 211.) Following this the Legislature enacted section 22.3 of the Civil Code, portions of which are quoted above.

In construing the legislation, the Supreme Court held that it did not destroy the common law negligence action but merely suspended it until after the specified date in 1963. (*Corning Hospital Dist.* v. *Superior Court,* 57 Cal.2d 488, 495 [20 Cal. Rptr. 621, 370 P.2d 325].)

It may be noted here that, at the time of trial of the instant action, neither counsel nor the court had the benefit of the Supreme Court's construction of this legislation. At the commencement of the trial, appellants' counsel moved to strike the cause of action founded upon common law negligence upon the grounds that the Legislature, by adopting section 22.3 of the Civil Code, had "re-enacted" the doctrine of sovereign immunity. The motion to strike was denied, and the case proceeded to trial on this cause of action along with the others.

After the decision in *Muskopf,* the defendant therein sought and obtained a peremptory writ of prohibition which restrained the trial court from further proceeding in the action except to permit the filing of pleadings and to allow discovery and perpetuation of evidence. The court specifically held the action should not be brought to trial until after the specified date in 1963. (*Corning Hospital Dist.* v. *Superior Court, supra,* 57 Cal.2d 488.)

The writ of prohibition is issued in those instances where the proceedings of any tribunal, exercising judicial functions, are without or in excess of the jurisdiction of such tribunal. (Code Civ. Proc., § 1102.) We believe the Supreme Court, in issuing the peremptory writ of prohibition in *Corning,* must have concluded that, if the trial court proceeded to trial in a cause of action which had been suspended by the act of the Legislature, such conduct would have been in excess of its jurisdiction. Likewise, we believe the trial court in the instant case, in proceeding to trial on a cause of action which had been temporarily suspended by act of the Legislature, acted in excess of its jurisdiction.

Since jurisdiction cannot be conferred by consent, it is immaterial that appellants did not (as the subsequent decision in *Corning* shows they could and should have done) move for a continuance of the trial on the common law negligence cause of action. Lack of jurisdiction may be raised at any time and, even had it not been urged before us, we would have been under a duty to notice it.

## VII

Appellants further contend that "[t]he trial of the cause against appellants on the legal theories of common law negligence and against appellant district under the Public Liability Act was in excess of the trial court's jurisdiction and the ensuing judgment based on such theories must be voided on this appeal." We believe each of these contentions has been answered.

## VIII

■ Appellants further claim that "even if the judgment could be viewed in terms of inverse condemnation, the special verdicts rendered still leave, as an indistinguishable mass, the theories of nuisance, common law negligence and Public Liability Act liability. They assert that the special "inverse condemnation" verdicts with the ambiguous wording "in whole or in part" leave it indeterminate to what degree the jury found the elements of inverse condemnation or to what degree the jury was using a portion of the inverse condemnation theory in conjunction with other unspecified legal theory in rendering that special verdict.

The jury in addition to the general verdicts, returned the following special verdicts: " . . . We the jury in the above entitled action, find that the addition of the five culverts at the 223rd Street was not constructed and designed according to good engineering practices. . . .

" . . . We the jury in the above entitled action, find in favor of plaintiffs, Joseph Granone and Edward Tsuruta, and against the County Flood Control District, in whole or in part, on the theory of inverse condemnation. . . .

" . . . We the jury in the above-entitled action, find in favor of plaintiffs, Joseph Granone and Edward Tsuruta, and against the Los Angeles County, in whole or in part, on the theory of inverse condemnation. . . . "

It seems to us that these special verdicts fairly construed in the light of the evidence, are no more and no less than a finding of negligence on the part of appellants.

The evidence was not singled out or segregated as being applicable to any particular cause of action, and as heretofore pointed out, it was sufficient to sustain a cause of action under each theory as to both appellants, except as to appellant district under the Public Liability Act.

■ It is well settled that, where several counts or issues are tried, a general verdict will not be disturbed if a single

count or issue is sustained by the evidence and is unaffected by error, even though another has no sufficient evidence to sustain it and has had reversible error committed concerning it. (*Berger* v. *Southern Pac. Co.*, 144 Cal.App.2d 1, 5-6 [300 P.2d A.L.R.2d 1104]; *Guerra* v. *Balestrieri*, 127 Cal.App.2d 511, 517 [274 P.2d 443]; *Moss* v. *Coca Cola Bottling Co.*, 103 Cal. App.2d 380, 384-385 [229 P.2d 802].)

## IX

Appellants next urge that '' [e] rrors of law occurring during the trial of the cause in the admission and exclusion of evidence, ruling on motions and in the giving and refusal of instructions resulted in a miscarriage of justice requiring a reversal of the judgment.''

Under this head appellants complain that certain instructions given were prejudicial. We have examined all of the instructions given and, considering the criticized instructions in conjunction with the entire charge to the jury, we find no error therein.

■ Appellants further claim that the court committed reversible error in denying their motion for a mistrial after it was discovered that one of the jurors had allegedly approached plaintiff Granone and offered to influence the verdict in consideration of the payment of money. When this incident was brought to the attention of the trial judge, he immediately discharged the suspected juror and, in the presence of counsel, examined under oath each remaining juror as to his or her knowledge of the incident and whether anything had occurred in or out of the court room which might tend to unlawfully influence each juror in arriving at a fair and impartial verdict. At the conclusion of this lengthy interrogation, the trial judge expressed his findings in the following language. ''At this time I should like to thank you personally and individually for your cooperation with this court in the manner in which you frankly and openly answered the questions put to you by the court. I might state that I observed closely your facial expressions and the manner in which questions were answered and I find at this time that you and each of you have not been influenced in any manner whatsoever by this unfortunate incident or by [the suspected juror] in particular.'' The trial was then resumed after an alternate juror was seated.

We have examined the transcript of the foregoing proceedings and we believe the testimony adduced was sufficient to support the order denying the motion for mistrial. We find no evidence therein suggesting that the alleged misconduct of

the discharged juror had in anywise tainted the minds of the remaining jurors, or that they had any knowledge or suspicion of the incident. Since the juror who acted improperly was discharged, and since the trial court found upon sufficient evidence, that the remaining jurors were unbiased by what had happened, there was no misconduct by the jury which affected the final verdict. (*Sepulveda* v. *Ishimaru,* 149 Cal.App.2d 543 [308 P.2d 809]; *Wilson* v. *California Cab Co.,* 125 Cal. App. 383, 386 [13 P.2d 758].) ▮▮▮ Whether the misconduct of a trial juror, ultimately, affected the minds of the other jurors, is a question for the determination of the trial judge. (*Lafargue* v. *United Railroads,* 183 Cal. 720, 726 [192 P. 538]; *Johnston* v. *Peairs,* 117 Cal.App. 208, 219 [3 P.2d 617].)

▮▮▮ Appellants next contend that it was error, sufficient to warrant reversal, for the trial court to have ''singled out Instruction No. 9 (Revised) on the elements of inverse condemnation and sent it alone with the jurors into the jury room.''

The record discloses that, after the jury had been instructed, one of the jurors asked ''What exactly does inverse condemnation mean?'' After considerable consultation with counsel out of the presence of the jury, the court concluded that it would be proper to reread one of the instructions theretofore given. The jury returned to the box and the following proceedings took place:

''THE COURT: I am going to read one of the instructions given you. It contains what I think is the definition, *but you must remember that you cannot take this one instruction alone. You must consider this one instruction in the light of all of the other instructions that the Court has given you.* (Italics added.)

'' 'Section 14 of Article I of the California Constitution provides that private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for the owner. If plaintiff's property is in fact taken or damaged by either the County or District's construction or maintenance for a public use, plaintiffs are entitled to maintain an action in inverse condemnation and recover such damages.' ''

This instruction was requested originally by both appellants and was given, and, as indicated above, was reread to the jury, upon the request by one of the jurors for further clarification on the subject of inverse condemnation. A copy of

the instruction was given to the jury, and was taken by them to the jury room.

It should be noted at the outset that the trial judge admonished the jury that they should not consider this instruction standing alone, but should consider it in the light of all the other instructions. We assume the jury heeded this admonition to consider instruction Number 9 (revised), a copy of which was taken by them to the jury room, in the light of all the other instructions.

 The written instructions of the court are not among the papers which the jury is authorized to take into the jury room. (Code Civ. Proc., §§ 612-614.) While it was error to permit the instruction to go into the jury room, prejudice is not presumed therefrom. There must be an affirmative showing of prejudice to justify a reversal in the absence of other errors in the conduct of a trial. (*Shelton* v. *Burke*, 167 Cal.App.2d 507, 509 [334 P.2d 616].)

This appears to be the rationale of such cases as *Fererira* v. *Silvey*, 38 Cal.App. 346, 359 [176 P. 371]; *Melikian* v. *Independent P. S. Co.*, 8 Cal.App.2d 166, 168 [47 P.2d 539]; *Day* v. *General Petroleum Corp.*, 32 Cal.App.2d 220, 237-238 [89 P.2d 718]; *Lewis* v. *Southern Pac. Co.*, 98 Cal.App.2d 358, 362-363 [220 P.2d 431]; *Chambers* v. *Southern Pac. Co.*, 148 Cal.App.2d 873, 877-878 [307 P.2d 662]. It was said in *Shelton* v. *Burke, supra*, at page 509, that "[a]ny singling out of that subject was done by the jury (not by the judge) in the course of their deliberation. Sending the instruction in to them, to be read in the jury room, would not seem to give this subject any greater emphasis than to have called them into the courtroom (which would have been proper) for the judge again to read it to them there." Under the circumstances here shown, we find no prejudice.

Appellants' last contention is that "[t]he judgment is without the support of substantial evidence."

We believe it has been demonstrated herein, without further comment, that this contention is without merit.

The order denying the motion for judgment notwithstanding the verdict and the judgment are affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied January 22, 1965, and appellants' petition for a hearing by the Supreme Court was denied March 3, 1965.